IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AFFINITY HEALTHCARE GROUP VOORHEES, LLC, and DR. KENNETH BROWN, | Civil Action No.: 1:21-cv-00800-RMB-AMB |
| Plaintiffs, | **ORAL ARGUMENT REQUESTED** |
| v. | |
| TOWNSHIP OF VOORHEES, VOORHEES TOWNSHIP ZONING BOARD, TOWNSHIP ZONING OFFICER JACLYN BRADLEY, and VOORHEES TOWNSHIP PLANNING BOARD, | Return Date:  February 7, 2022 |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Samuel Reale, Jr., Esq.  (SR1097)
HELMER, CONLEY & KASSELMAN, P.C.
600 Beverly Rancocas Road
Willingboro, NJ 08046
(609) 877-6550

*Attorney for Plaintiffs Affinity Healthcare Group Voorhees, LLC, and Dr. Kenneth Brown*

**<ins>TABLE OF CONTENTS</ins>**

TABLE OF AUTHORITIES ......................................................................................... iii

I.     PRELIMINARY STATEMENT ........................................................................ 1

II.    STATEMENT PURSUANT TO LOCAL RULE 56.1 ....................................... 7

III.   ARGUMENT.................................................................................................... 9

      A.   Defendants Have Violated The Americans With Disabilities Act And The Rehabilitation Act ................................................................................... 9

           i.     Disparate Treatment.......................................................................... 13

           ii.    Disparate Impact ............................................................................... 16

           iii.   Failure To Provide Reasonable Accommodation ................................. 18

      B.   Defendants Have Violated Plaintiffs Rights To Equal Protection Under the Fourteenth Amendment Through Selective Enforcement Of Defendants' Land Use Laws .............................................................................................. 21

      C.   Defendant, Planning Board, Violated Plaintiffs Due Process And Equal Protection Rights To A Fair And Impartial Review Of Its Change Of Use Review Application ...................................................................................... 26

      D.   Defendant Planning Board's Decision To Deny Plaintiffs' Application Was Arbitrary And Capricious .......................................................................... 34

      E.   Defendants Violated The New Jersey Law Against Discrimination By Denying Plaintiffs' Zoning Permit Applications and Change of Use Review Application In Contravention Of The New Jersey Municipal Land Use Law And Based Upon Improper Discrimination Against Plaintiffs And Their Prospective Patients ....... 39

IV.   CONCLUSION.............................................................................................. 40

## TABLE OF AUTHORITIES

**Cases**

*901 Ernston Rd., LLC v. Borough of Sayerville Zoning Bd. Of Adjustment,* Civ No. 18-2442, WL 2176175 May 11, 2018, Doc. 22 at 14 (D.N.J. 2018)...........................................................16, 21, 26

*Anderson v. Duncan,*
20 F. Supp. 3d 42 (D.D.C. 2013)..........................................................................................17

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)...........................................................7

*Bay Area Addiction Research and Treatment Inc. v. City of Antioch,* 179 F. 3d 725 (9th Cir. 1999)....................................................................................................................................10, 24

*Bayshore Sewage Co. v. DEP,* 122 N.J. Super. 184, 189 (Ch. Div. 1973).....................................35

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F. 2d 1358, 1363 (3d Cir. 1992) .....................8

*Bennet v. City of Slidell,* 697 F. 2d 657, 661 (5th Cir, 1983)) ..........................................................22

*Black Car Assistance Corp. v. New Jersey,* 351 F. Supp. 2d 284, 286 (D.N.J. 2004) .....................8

*Bogdan v. Abbott,*
524 U.S. 624 (1998)..............................................................................................................12

*Broomall's Lake Country Club v. Borough Of Media,* 2018 U.S. Dist. LEXIS 207409 (E.D. Pa. 2018).....................................................................................................................................10

*Bruni v. City of Pittsburgh,* 824 F. 3d 353, (3d Cir. 2016)............................................................39

*Cell S. of NJ v. Zoning Bd. Of Adjustment,* 172 N.J. 75, 88 (2002) ...............................................33

*Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986) .................................................................7,8

*Chou v. Rutgers,* 283 N.J. Super. 524, 539 (App. Div. 1995) ........................................................35

*Cmty. Servs., Inc. v. Wind Gap Mun. Auth.,*
421 F.3d 170 (3d Cir. 2005) ...........................................................................................13, 16

*Cmty. Housing Trust v. Dep't of Consumer & Regulatory Affairs,*
257 F. Supp. 2d 208 (D.D.C. 2003)......................................................................................18

*CRC Health Group, Inc. v. Town of Warren,* No. 2:11-cv-196 , 2014 WL 2444435 at *36 April 1, 2014 (D. Me. 2014) ..........................................................................................................11

*Fallone Properties LLC v. Bethlehem Tp. Planning Bd.,* 369 N.J. Super. 552, 560 (App. Div. 2004) ................................................................................................................35,37

*Hansen Foundation, Inc. v. City of Atlantic City,* 504 F. Supp. 3d 327, 342 (D.N.J. 2020) .........39

*Helping Hand, LLC v. Baltimore County, MD,* 515 F. 3d 356, 366 (4th Cir. 2008) ................28, 32

*Hill v. Borough of Kutztown,* 455 F. 3d 225, 239 (3d Cir. 2006) ...................................................10

*Horizon House Developmental Servs., Inc. v. Twp. of Upper Southhampton,*
804 F. Supp. 683 (E.D. 1992) .................................................................................................13,14

*Hovsons, Inc. v. Twp. of Brick,*
89 F.3d 1096 (3d Cir. 1996) ...................................................................................................18, 19

*Innovative Health Systems v. City of White Plains,* 117 F. 3d 37 (2d Cir. 1997)..11, 14, 15, 26, 28

*In Re Taylor,* 158 N.J. 644, 656 (1999) ..........................................................................................34

*Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp.,*
455 F.3d 154 (3d Cir. 2006) ...................................................................................................12, 40

*Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Scotch Plains,*
284 F.3d 442 (3d Cir. 2002) ...................................................................................................12, 17

*L & L Clinics, Inc. v. Twp. Of Irvington,* 189 N.J. Super. 332 (App. Div. 1983) ...................11, 12

*Marino v. Indus. Crating Co.,* 358 F. 3d 241, 247 (3d Cir. 2004)) ..................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) ..............................7

*McKivitz v. Twp. Of Stowe,* 769 F. Supp. 2d 803, 823-24 (W.D. Pa. 2010)...................................10

*Metro Treatment of Me. v. City of Bangor,* Docket No.: 1-16-cv-0433-JAW; 2016 U.S. Dist. LEXIS 157619 at 24 (D. Me. 2016) ...................................................................................11, 12, 14

*Metropolitan Housing Dev. Corp. v. Village of Arlington Heights,*
558 F. 2d 1283 (7th Cir. 1977) ...............................................................................................11, 14

*Mt. Holly Gardens Citizens in Action Inc. v. Twp. Of Mount Holly,* 658 F. 3d 375, 381 (3d Cir. 2011) ..............................................................................................................................................13

*MX Group, Inc. v. City of Covington,* 293 F. 3d 326 (6th Cir. 2002)........................................11, 24

*Newman v. GHS Osteopathic, Inc.* 60 F. 3d 153, 157-58 (3d Cir. 1995) ........................................10

*New Directions Treatment Serv. v. City of Reading,* 400 F. 3d 293 (3d Cir. 2007)....10, 11, 14, 24

*New York SMSA v. Bd. Of Adj.*, 370 N.J. Super. 319, 338 (App. Div. 2004).................................33

*Oxford House, Inc. v. Twp. Of Cherry Hill,* 799 F. Supp. 450 (D.N.J. 1992) .........................11, 17

*Podobnik v. U.S. Postal Serv.*, 409 F. 3d 584, 594 (3d Cir. 2005) ....................................................8

*Reg'l Econ. Cmty Action Program, Inc. v. City of Middletown,*
294 F.3d 35 (2d Cir. 2002) ..........................................................................................................14, 18

*ReMed Recovery Care Ctrs. v. Twp. of Willistown,*
36 F. Supp. 2d 676 (E.D. Pa. 1999)....................................................................................................18

*Resident Advisory Bd. v. Rizzo,*
564 F. 2d 126 (3d Cir. 1977) ..............................................................................................................14

*Riya Finnegan v. South Brunswick,* 197 N.J. 184, 192-193 (2008) .........................................33, 34

*Seibert v. Dover Tp. Bd. Of Adj.*, 174 N.J. Super. 548 (Law Div. 1980).........................................29

*School Bd. Of Nassau County v. Arline,* 480 U.S. 273 (1987) ...........................................15, 25, 26

*Schwartz v. City of Treasure Island*, No. 805-CV-1696, 2006 WL 2521399, at *14 (M.D. Fla. Aug. 1, 2006) ......................................................................................................................................10

*Shields v. Zuccarini*, 254 F. 3d 476, 481 (3d Cir. 2001) ....................................................................8

*Smith Berch Inc. v. Baltimore County, Maryland,*
115 F. Supp. 2d 520 (D. Md. 2000)....................................................................................................14

*Smith Berch, Inc. v. Baltimore County,*
64 Fed. Appx. 887 (4th Cir. 2003)......................................................................................................14

*Smith v. Fair Haven Zoning Bd.*, 335 N.J. Super. 111 (App. Div. 2000)..................................27, 35

*Sullivan v. City of Pittsburgh, Pa.,*
811 F.2d 171 (3d Cir. 1987) ...............................................................................................................12

*Thorpe v. Upper Makefield Twp.,* 758 Fed Appx. 258 (3d Cir. 2018). .........................................21

*THW Group, LLC v. Zoning Board of Adjustment,* 86 A. 3d 330 (Commw. Ct. Pa 2014)....11, 24, 25

*Tomko v. Vissers,* 21 N.J. Super. 111, 120 (App. Div. 2000)..........................................................35

*United States v. City of Birmingham, Mich.,*
727 F 2d. 560 (6th Cir. 1984) ...................................................................14

*United States v. City of Blackjack, Mo.,*
508 F. 2d 1179 (8th Cir. 1974) ................................................................17

*Village of Willowbrook v. Olech,* 528 U.S. 562 564 (2000)........................22

*Yick v. Hopkins,* 6 S. Ct. 1064 (1885)......................................................21

**Regulations and Statutes**

28 C.F.R. 35.130 .........................................................................10, 18, 19

29 U.S.C. 794(a) ....................................................................................9

29 U.S.C. § 705(9) ...............................................................................12

42 U.S.C. § 12102(1) .......................................................................12, 40

*ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553*...........18

*N.J.S.A.* 10:5-1 .................................................................................39, 40

*N.J.S.A.* 10:5-12.5 ...............................................................................39

*N.J.S.A.* 40:55D-1 .........................................................................15, 26

*N.J.S.A.* 40:55D-10 ....................................................................26, 27, 29

*N.J.S.A.* 40:55D-62 ..............................................................................37

*N.J.S.A.* 40:55D-70 ...............................................................................5

**Journals & Treatises**

*Gann New Jersey Zoning and Land Use* 6-3.3 ...........................................22

**Voorhees Township Zoning Code**

Section 152.132 ......................................................................................5

Section 152.052 ...........................................................................3,23, 36

Section 156.018 ..................................................................5, 19, 20, 24

## I.   PRELIMINARY STATEMENT

The instant action was brought by Plaintiffs, Dr. Kenneth Brown and his practice, Affinity Healthcare Group Voorhees, LLC, as a result of the intentional and fragrant violation of their and their disabled patients' rights under the <u>Americans with Disabilities Act</u> (ADA), and the <u>Rehabilitation Act of 1973</u> (RA) by the Defendants.  Additionally, the prejudicial conduct of the Defendants constituted violations of 42 *U.S.C.* <u>Section</u> 1983, as well as New Jersey's <u>Law Against Discrimination</u>.  Further, the Defendants' violated provisions on New Jersey's <u>Municipal Land Use Law</u>, *N.J.S.A.* 40:55D-1, *et seq.*  To implement their discriminatory plan, Defendants engaged in multiple courses of conduct designed, intended, and executed to frustrate Plaintiffs' efforts to operate a medical practice, licensed as an Opioid Treatment Program (OTP) by the State of New Jersey, and focused on the treatment of their disabled patients suffering from Opioid Use Disorder (OUD); conduct that ran afoul of the clear language of the applicable legislation and constitutional guarantees.

Although there is outstanding discovery, the material facts are well-established and not open to dispute.  Further, the courts have set forth clear standards as to what constitutes discriminatory and impermissible conduct in connection with municipal review of proposed OTP providers and facilities.  Here, there is no question but that Defendants consciously engaged in conduct based upon improper motivations intended to prevent disabled patients from accessing the full range of treatment modalities available to treat their illness. Essentially, Defendants' conduct was designed to impermissibly inject themselves into the doctor-patient relationship solely because they were opposed to patients receiving methadone, the recognized gold-standard of treatment, as part of their individual treatment regimen. The Defendants' individual and collective conduct was so egregious that it shocks the conscious: It is as if Defendants prepared a checklist of

1

impermissible conduct and then proceeded to check off items as they repeatedly and without any remorse engaged in the listed impermissible conduct. The Defendants' conduct can be summarized thusly: Statutory requirements, fundamental due process and equal protection rights, and court decisions be damned, we are going to place every roadblock and obstacle possible in Plaintiffs' path to keep those disable people from getting treatment in our town.

To better understand the present action, it is necessary to begin in early 2017, with Recovery Centers of America's (RCA) proposal to open an OTP at a location on Burnt Mill Road, in Voorhees Township; a site located in the Office-1 Zoning District, as defined by the Township's Zoning Ordinance. See: Exhibit A. Importantly, the RCA location is across the street from a day care center and within a short walk to the Osage Elementary School. See: Martin Cert ¶10; See also: Exhibit NN Overhead Google Map Screenshot. On March 29, 2017, Elaine Powell, then the Township Zoning Officer, issued a zoning permit to RCA permitting it to operate a "[p]rofessional office providing professional services including medical, social services and psychological services on an outpatient basis for individuals suffering from drug and alcohol addiction." See: Exhibit A. On January 10, 2017, Powell met with RCA representatives, accompanied by Mario DiNatale, the Township's Economic Development Director and a Class II member of the Defendant Planning Board. See Exhibit L. After the meeting, Powell reviewed the application with Stuart Platt, Esq., as a result of which it was determined that the use was a "permitted use under Office-1 zone."[1] Id. As part of the permitting process, Powell, in her capacity as Township Zoning Officer, executed a Certification, dated January 19, 2917, filed with the New Jersey Division of Consumer Affairs, Drug Control Unit, that confirmed that RCA's facility was within

---

[1] It is unclear which "hat" Mr. Platt was wearing at the time. Leaving aside the ethical implications of Mr. Platt's interaction with Ms. Powell, Mr. Platt would play an outsized role in the sham hearings conducted by the Defendant Planning Board in 2020.

the Office-1 zoning district, and that the "[storing and dispensing of Controlled Dangerous Substances in the building is [a] permitted use of the zone." See: Exhibit B (Emphasis added).

On or about February 6, 2017, Ms. Powell countersigned RCA's correspondence that it had been requested by the New Jersey Office of Licensure to submit additional documentation confirming its facility would be utilized as an outpatient OTP provider. See: Exhibit C. At no time was RCA required or requested to undergo any Planning Board or Zoning Board review of its proposed use. See: Plaintiffs' Statement of Material Facts ¶19 (hereinafter referred to as "Facts"). RCA currently operates a State licensed OTP at its' Voorhees location. See: Facts ¶16.

In 2018, Plaintiff Affinity leased offices located at 200 West Somerdale Road, within the Township of Voorhees, New Jersey: the offices being located within the Township's Office-1 Zoning District. See: Facts ¶11. Pursuant to *Section* 152.052, Permitted Uses, of the Voorhees Township Zoning Ordinance (the "Ordinance"), permitted uses the zoning district are defined as including offices of a recognized profession, including but not limited to medicine and social services. By definition, Plaintiffs' anticipated use of the non-residential property is a permitted use. See: Martin Cert. ¶ 5, Exhibit D (Ordinance Section 152.052).

On March 18, 2018, Ms. Powell, who continued in her position as Township Zoning Officer, issued a Zoning Permit, in the name of Dr. Ken Brown, a Plaintiff herein, to operate a "medical office engaging in behavioral health treatment services." See: Exhibit E. The initial zoning permit application submitted to Ms. Powell by the landlord, Mid America, identified the tenant as Dr. Brown, rather than his practice, Affinity, and simply identified the use as a "medical office." See: Exhibit F. Thereafter, Affinity delivered a copy of the Opioid Treatment Program 2018 Early Survey Application submitted to the Commission on Accreditation of Rehabilitation Facilities (CARF), which outlined and identified Affinity's projected treatment program, including that it was engaged

3

in the delivery of behavioral health services to its disabled patients.[2]   Ms. Powell's decision to issue

the zoning permit to Dr. Brown was consistent with her prior action with respect to RCA's facility.

And, as with RCA, Dr. Brown was not required or requested to seek any review from the Defendant

Board. See: Facts ¶18 and ¶30.  Ms. Powell was subsequently replaced by Defendant Jaclyn Bradley,

who was appointed by the Defendant Township to serve as the Township Zoning Officer.[3]

     In October 2019, Plaintiffs were notified by the New Jersey Department of Health's

Licensing Unit that prior to the issuance of the State license to operate an OTP, Affinity, as the

agency to be licensed, would be required to submit a Township-issued certificate on which appears

the notation: "Opioid Treatment Program." See: Facts ¶36.  This was a modification of the

licensing requirements being utilized by the State at the time of RCA's 2017 application. Id.  To

comply with the current New Jersey Department of Health's licensing requirement, Plaintiffs

prepared and submitted a zoning permit application to Defendant Powell seeking the issuance of

the amended zoning permit. Id. Beginning with the submission of that application on or about

November 12, 2019, Plaintiffs' efforts to combat the ongoing opioid crisis have been thwarted by

Defendants.  At the outset, the Defendants' plan was to hinder Plaintiffs in securing the necessary

amended Zoning Permit through a maze of ever-changing requirements:  the goal posts kept

moving back.  This culminated in Defendant Bradley notifying Plaintiffs on December 11, 2019,

that they would have to apply to the Defendant Planning Board for a review of the change in a

non-residential tenancy, as provided for in *Section* 156.018 of the local zoning ordinance. See:

Exhibit GG Bradley Email.

---

[2] There is no dispute but that OTPs engaged in the treatment of those suffering from OUD are, in fact, engaged in behavioral health treatment services.  This is the description adopted by CDC, NIH, CMS, SAMHSA, and the New Jersey Department of Health.  See:  Exhibit G

[3] Plaintiffs have no direct information as to the circumstances surrounding Ms. Bradley's appointment nor her underlying qualifications.  Plaintiffs are of the belief that Ms. Powell retired at some point between the March 2018 issuance of the permit to Dr. Brown and the Plaintiffs subsequent application seeking an amended Zoning Permit.

Defendants' discriminatory conduct was not limited to the refusal to issue the amended Zoning Permit; it extended to and through a hearing and review process conducted by the Defendant Planning Board: a process forced upon Plaintiffs as part of the Defendants' discriminatory plan. The record of the proceedings before the Defendant Planning Board present an ugly image of a "kangaroo court" directed with the able assistance of the Board's Solicitor.

During the hearings before the Defendant Planning Board in connection with review of Plaintiffs' *Section* 156.018 application[4], Planning Board members and the Board's Solicitor, freely and without inhibition, not only embarked on a course of discriminatory conduct intended to deny Plaintiffs' the fundamental due process rights to which they were entitled, but also repeatedly engaged in discriminatory conduct and comments universally held by the courts to violate the <u>ADA</u> and the <u>RA</u>. The improper conduct ran the gamut: from restricting Plaintiffs from offering relevant testimony and evidence, offering on the record patently discriminatory statements; through distain and disinterest during the hearings, to improper consideration of speculation, fostering false and factually ungrounded stereotypes, and engaging in off the record undisclosed discussions related to Plaintiffs' application.[5] The list is not exhaustive. The behavior of the Planning Board, abetted by its professional staff, as noted earlier herein, can best be understood as a textbook example of what land use boards have been cautioned for decades to avoid. Without offering any factual basis, Defendants advanced the speculative and improper belief that OTPs, including Plaintiffs', raise crime rates, pose a danger to the community more so than other types of medical offices and negatively impact property values. See: Subsection C of this instant Motion. Among the more

---

[4] Section 156.018 of the Township's Zoning Ordinance, affords an opportunity for the Planning Board to review the change in tenancy in a non-residential building. It should not be confused with the statutory procedure for securing a use variance set forth at *N.J.S.A.* 40:55D-70.

[5] This latter violation was admitted to by the Defendants in connection with their pending joint motion seeking a protective order in which the appended privilege log discloses discussions between Defendant Bradley, Stuart Platt, Esq., Christopher Norman, Esq., the Township Administrator, the Planning Board Chairman, and the Township's Economic Development Director, a Class II member of the Defendant Board.

5

egregious examples of improper conduct was the Defendants' extortion of Plaintiffs hours before the last Planning Board hearing, in violation of the New Jersey Municipal Land Use Law; specifically, N.J.S.A. 40:55D-53.2, when they demanded a $8,013.82 payment to the Township's escrow account for the application to be heard.  See: Exhibits QQ, RR, and SS.  See also: Reale Cert ¶16.

In sum, the Defendants intentionally misapplied the Township's zoning permit application procedures to deny Plaintiffs' the issuance of an amended Zoning Permit for a permitted use as evidenced by then Zoning Officer Powell's issuance of the 2017 Zoning Permit to RCA; a permitted use confirmed by Ms. Powell in connection with the March 2018 Zoning Permit issued in the name of Dr. Brown.  See: Exhibit E.

Continuing their blatant discriminatory behavior, Defendants denied Plaintiffs' tenancy review application by creating a wholly fictional distinction between a "medical clinic" and a "medical office."  Defendants lack a credible and minimally rational justification for their collective decisions, decisions that constitute patent violations of the ADA, the RA, the New Jersey LAD, and the constitutional protections afforded by both the United States Constitution and the State Constitution of 1947.

There is no reasonable or logical understanding of the events that occurred in connection with the instant action other than that the Defendants, their agents, and professional staff subjected Plaintiffs and their intended patients to patent discrimination, disparate treatment, and disparate impact, while failing to provide reasonable accommodation; all in violation of the ADA, RA, and the Fourteenth Amendment.

## II.    STATEMENT PURSUANT TO LOCAL RULE 56.1

Plaintiffs' motion for summary judgment should be granted because the documents, evidence, and record of the proceedings before the Defendant Planning Board are so overwhelming that there can be no doubt as to Defendants' violation of the <u>Americans with Disabilities Act</u> ("ADA"); the <u>Rehabilitation Act of 1973</u> ("RA"); 42 *U.S.C.* Section 1983; the Fifth and Fourteenth Amendments; and various New Jersey State Laws. The nature of the record is such that Defendants cannot logically direct the Court to any material facts identified herein where there is a genuine dispute.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 247-48 (1986) (Emphasis added). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 *U.S.* 574, 586 (1986).

The moving party must show that, if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 *U.S.* 317, 322-23 (1986). Once the moving party meets its initial burden, the burden then shifts to the non-movant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations,

7

unsupported assertions or denials of its pleadings. *Shields v. Zuccarini*, 254 *F.3d* 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 *F.3d* 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 *U.S.* at 255).  See also: *Anderson*, 477 *U.S.* at 249; and *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 *F. 2d* 1358, 1363 (3d Cir. 1992).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 *F.3d* 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 *U.S.* at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 *F. Supp. 2d* 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof [,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 *U.S.* at 322-23.

Defendants' denial of Plaintiffs' zoning permit and change of tenancy review applications were intentionally discriminatory as the decisions were made in the context of improper opposition from Defendants, including, in the context of the Zoning Officer's denial of the applications seeking the amended Zoning Permits, a series of ever-changing demands and the ignoring of the program materials submitted by Plaintiffs over a 23-month period.  The denial of Plaintiffs' Change of Use Review Application, notwithstanding the Planning Board's self-serving after the fact resolution, relied upon the creation of a non-existent, arbitrary, and capricious distinction between a "medical office" and "medical clinic."   A distinction the Defendants had not made in

8

connection with the prior approval of RCA's OTP in 2017 or the approval of the 2018 Zoning Permit issued to Dr. Brown.  Further, the decision ignored the substantial materials, evidence, and testimony provided by Plaintiffs, in support of the change in commercial tenancy review application before the Defendant Planning Board.

All of the conduct and events described in Plaintiffs' Complaint establish multiple violations of the Federal and State law.  At no point have Defendants attempted to comport their individual and collective conduct with the strict requirements of the law.  Summary Judgment in favor of Plaintiffs is supported by the record, is in accord with the applicable law, and there are no disputed material facts.

III.   **ARGUMENT**

A. **Defendants Have Violated The Americans With Disabilities Act And The Rehabilitation Act**

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C. § 794(a).

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 *U.S.C.* § 12132. ADA regulations prohibit public entities from discriminating against qualified individuals with disabilities (1) in administering a licensing program in a manner that subjects them to discrimination on the basis of the disability and (2) in establishing requirements for programs or activities of licensees that subject qualified individuals with disabilities to discrimination on the basis of disability. 28 *C.F.R.* § 35.130(b)(6). The regulations prohibit public entities from

9

determining the location of a facility in a way that has the purpose or "effect of excluding individuals with disabilities from, [or] denying them the benefits of [the facility], or otherwise subjecting them to discrimination." 28 *C.F.R.* § 35.130(4)(i). Further, the Third Circuit has noted that "'[a]s the ADA simply expands the Rehabilitation Act's provisions against discrimination into the private sector, Congress has directed that the two acts' judicial and agency standards be harmonized' and we will accordingly analyze the two provisions together." *New Directions Treatment Servs. v. City of Reading*, 490 *F.3d* 293, 302 (3d Cir. 2007) (*quoting Newman v. GHS Osteopathic, Inc.*, 60 *F.3d* 153, 157-58 (3d Cir. 1995)).

The ADA and RA apply to municipal zoning decisions. *See, e.g., McKivitz v. Twp. of Stowe*, 769 *F. Supp. 2d* 803, 823-24 (W.D. Pa. 2010) ("… the Rehabilitation Act and the ADA are all applicable to zoning decisions."); *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 *F.3d* 725, 730 (9th Cir. 1999) (the ADA and RA "apply to zoning"). Due to their close relationship and many similarities, courts analyze these statutes as essentially coextensive. *See Collings v. Longview Fibre Co.*, 63 *F.3d* 828, 832 n. 3 (9th Cir.1995) (noting that "Congress intended judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting the ADA"); *Schwarz v. City of Treasure Island*, No. 805-CV-1696, 2006 WL 2521399, at *14 (M.D. Fla. Aug. 1, 2006). A plaintiff states a claim for violation of the Equal Protection clause when he/she/it "alleges that he/she/it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 *F.3d* 225, 239 (3d Cir.2006); *See also, Broomall's Lake Country Club v. Borough of Media*, 2018 U.S. Dist. LEXIS 207409 (E.D. Pa 2018).

In applying the tenets of these anti-discrimination statutes, courts consistently find violations where municipalities apply their zoning laws in a manner that thwarts an addiction

treatment provider's ability to open and operate in the community. *See New Directions*, 490 *F.3d* at 304-05 (application of a law that "singles out methadone clinics for different zoning procedures is facially discriminatory under the ADA and the Rehabilitation Act"); *MX Group, Inc. v. City of Covington*, 293 *F.3d* 326, 328 (6th Cir. 2002) (denial of zoning permit and ordinance targeting methadone clinics is discriminatory under the ADA and Rehabilitation Act); *Metro Treatment of Me. v. City of Bangor,* Docket No.: 1:16-cv-00433-JAW; 2016 U.S. Dist. LEXIS 157619 at 24 (D. Me. 2016)(methadone clinic cannot be treated differently than a medical clinic); *THW Group, LLC v. Zoning Board of Adjustment*, 86 *A. 3d* 330, 332 (Comm. Ct. PA 2014) (municipalities are not free to apply different zoning standards to methadone clinics than to other medical clinics.); and *Oxford House, Inc. v. Twp. Of Cherry Hill*, 799 *F. Supp*. 450 (D.N.J. 1992) (township ordinance discriminatory under FHA); *Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 41 (2d Cir.1997) ("lack of a credible justification" for the board's decision to classify the center as a "clinic" rather than an "office."); *CRC Health Group, Inc. v. Town of Warren*, No. 2:11-cv-196, 2014 WL 2444435 at *36 (D. Me. 2014) (court ruled that a methadone clinic cannot receive less favorable treatment than other medical facilities).

As pertinent to the issues presented in the instant action, the Superior Court of New Jersey, Appellate Division has long recognized the unity between physicians and their medical practices. *L & L Clinics, Inc., et al., v. Town of Irvington*, 189 *N.J. Super*. 332 (App. Div. 1983). Still further, the *L & L Clinics'* Court rejected, "as unreasonably restricted," an interpretation of a municipality's land use ordinance that resulted in an "exclusionary interpretation" of permitted uses in the refusal to issue a Certificate of Occupancy to a "medical professional office" providing a use as a clinical facility for methadone maintenance treatment of heroin addicts. *L & L Clinics, Inc.*, *supra,* at 335-337.

11

The ADA and RA define "disability" or "handicap" almost identically. *See Bogdan v. Abbott*, 524 *U.S.* 624, 631 (1998). Under these statutes, a disability is a physical or mental impairment that substantially limits one or more of a person's major life activities. 42 *U.S.C.* § 3602(h)(1); 42 *U.S.C.* § 12102(1); 29 *U.S.C.* § 705(9). Individuals recovering from drug and alcohol addiction qualify as disabled under these anti-discrimination laws. *See Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp.*, 455 *F.3d* 154, 156 n.5 (3d Cir. 2006) ("recovering alcoholics and drug addicts are handicapped, so long as they are not currently using illegal drugs"); *Sullivan v. City of Pittsburgh, Pa.*, 811 *F.2d* 171, 182 (3d Cir. 1987).

Violations of the ADA and RA's prohibitions on disability discrimination may proceed under any or all of three liability theories: (1) disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations. *See* 42 *U.S.C.* § 3604(f); *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Scotch Plains*, 284 *F.3d* 442, 448 (3d Cir. 2002). Here, Defendants imposed procedures, roadblocks, and delays upon Plaintiffs that were not imposed upon similar medical offices treating non-disabled persons by:

(a) subjecting Plaintiffs' permit applications to delays;
(b) required Plaintiffs to apply for a change of use review;
(c) requiring a public hearing on Plaintiffs' change of use application; and
(d) only hours prior to the final Board hearing, in a departure from the statutory procedural requirements, Defendants demanded that Plaintiffs deposit over $8,000.00 with the Township or the application would not be heard. See: Reale Cert ¶16.

This type of conduct has long-been recognized as establishing discriminatory intent. *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 *F.2d* 1283, 1284 (7th Cir. 1977) (evidence of discriminatory intent includes "the sequence of events leading up to the challenged decision," "departures from normal procedural sequences," and departures from

normal substantive criteria."), cited with approval in *Mt. Holly Gardens Citizens in Action Inc. v. Twp. of Mount Holly*, 658 *F.3d* 375, 381 (3rd Cir. 2011) (housing case).

For the reasons discussed more fully below, there are no facts at issue from which a rational factfinder could conclude that Defendants' (1) denial of Plaintiffs' two (2) zoning permit applications; (2) impermissibly applied procedures, roadblocks, and delays; (3) insistence on a change of use application and hearing where none was required; and (4) an arbitrary and unjustified denial of a change of use application does not constitute unlawful discrimination by way of disparate treatment, disparate impact, and failure to provide reasonable accommodations as identified in the ADA and RA.

### i. Disparate Treatment

"To prevail on a disparate treatment claim, a plaintiff must demonstrate that some discriminatory purpose was a 'motivating factor' behind the challenged action." *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 *F.3d* 170, 177 (3d Cir. 2005). The discriminatory purpose need not be motivated by hostility towards a particular handicap, as "[t]he plaintiff is only required to 'show that a protected characteristic played a role in the defendant's decision to treat her differently.'" Id. (quoting *Cmty. Housing Trust v. Dep't of Consumer & Regulatory Affairs*, 257 *F. Supp.* 2d 208, 225 (D.D.C. 2003)); *See also Horizon House Developmental Servs., Inc. v. Twp. Of Upper Southampton*, 804 *F. Supp.* 683, 696 (E.D. Pa. 1992) ("In order to prove intentional discrimination it is not necessary to show an evil or hostile motive. It is a violation to discriminate even if the motive was benign or paternalistic"). In assessing whether a municipality acted with discriminatory intent, courts consider: (1) the discriminatory impact of the municipal action; (2) the historical background of the action; (3) the sequence of events leading to the action; (4) departures from normal procedural sequences; and (5) departures from normal substantive criteria.

13

See *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995); *Resident Advisory Bd. V. Rizzo*, 564 F.2d 126, 142 n. 22 (3d Cir. 1977); *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1284 (7th Cir. 1977) (on remand), cert. denied, 434 U.S. 1025 (1978); *United States v. City of Birmingham, Mich.*, 727 F.2d 560, 564 (6th Cir. 1984) (listing the above factors). Zoning decisions lacking a "credible justification" violate the ADA and the RA. *Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 41 (2d Cir.1997). *Horizon House*, 804 F. Supp. at 690-700 (concern about lowering property values was evidence of intentional discrimination); *New Directions*, 490 F.3d at 305 (unfounded fear of crime evidence of intentional discrimination); *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 50-51 (2d Cir. 2002) (anti-proliferation comments more than suffice to establish prima facie case); *Horizon House*, 804 F. Supp. at 690 (statement that thirty group homes "was enough for the town" supported a finding of discriminatory intent). Procedural requirements imposed on entities serving the disabled that are not imposed on similar facilities also violate the ADA. *Smith Berch, Inc. v. Baltimore County, Maryland*, 115 F. Supp. 2d 520, 522 (D. Md. 2000), *vacated on other grounds*, *Smith-Berch, Inc. v. Baltimore County*, 64 Fed. Appx. 887, 890 (4th Cir.2003).

In this case, Defendants imposed discriminatory procedures, including requiring a change of use review application and a public hearing. In doing so Defendants treated Plaintiffs differently than other property owners and tenants within the Office-1 Zoning District and other operators of outpatient healthcare facilities serving both disabled and non-disabled persons.

Further, the hearing record establishes that the Board members, the Board's professionals, and the general public, manifested discriminatory animus against persons in recovery sufficient to demonstrate evidence of intentional discrimination against Plaintiffs. The visual imagery, as evidence of discrimination was startling. Board members were, as captured on video:

14

1. Distracted;
2. Absent during portions of the hearings;
3. Asleep;
4. Driving an automobile;
5. Engaging others in conversation;
6. Eating and drinking; and
7. Watching television.[6]

It is impossible to analyze such conduct as anything other than Planning Board Members

complete lack of respect towards Plaintiffs as well as their own land use policies and procedures.

More importantly, it evidenced a clear predisposition with respect to the outcome of the hearings.

In other words, no matter what Plaintiffs' did or said over the course of the four (4) meetings, the

Planning Board Members were going to deny the application. The Board Members had their mind

made up from the outset, which is why they deemed it unnecessary to listen to and give Plaintiffs

a chance to put on their presentation.   Further, such conduct was so egregious it violated the Board

members' individual and collective responsibilities under the New Jersey Land Use Law, *N.J.S.A.*

40:55D-1, et seq.

It has been well-settled, beginning with the United States Supreme Court's decision in

*School Bd. Of Nassau County v. Arline*, 480 *U.S.* 273, 275 (1987), that prohibiting the opening of

methadone treatment center based on "speculative" fears is unlawful.   See: 42 *U.S.C.* §

12101(b)(1).   See also: *Innovative Health Systems v. City of White Plains*, 117 *F. 3d* 37 (2d Cir

1997) ("Although [a city] may consider legitimate safety concerns in its zoning decisions, it may

not base its decisions on the perceived harm from . . . stereotypes and generalized fears.").   It is

not enough that individuals pose a hypothetical or presumed risk.   Rather, the evidence must

establish that an individual does, in fact, pose a significant risk; a risk of serious nature.  See: *901*

*Ernston Rd., LLC, supra*, at p. 14 (evidence of intentional discrimination shown by board

---

[6]   See Exhibit K, Consisting of a Table providing time stamp references to the hearing of August 26, 2020, (2V) as
to the recorded activity.  The Exhibit also includes individual screen shots of the afore described conduct.

members' animus directed towards recovering addicts and associations with criminal behavior) (Thompson, J.).

Even if Defendants were able to point to some nondiscriminatory reason for their decisions, the discriminatory motive revealed by the Board members' disinterest, conduct, demeanor, and statements are individually and collectively sufficient to show discriminatory motive by the Defendants in denying Plaintiffs' application. *Cmty. Servs. Inc. v. Wind Gap Mun. Auth.*, 421 F. *3d* 170, 173 (3d Cir. 2005) ("The discriminatory purpose need not be malicious or invidious, nor need it figure 'solely, primarily, or even predominantly' into the motivation behind the challenged action."). The record of the Planning Board proceedings speaks for itself and nothing Defendants say now in response to this motion can alter the reality: the animus exhibited by the Board, its professionals, and the public was palpable, real, and discriminatory.

The obvious departures from the reasonable interpretation of Voorhees' zoning ordinance; the surrender by the Planning Board members of their individual and collective responsibilities; the Defendants' disregard of applicable law governing the evaluation of land use applications related to OTPs; and the absolute failure to engage in a substantive review of Plaintiffs' various application, evince Defendants' discriminatory intent and resulted in undeniably disparate treatment. Defendants' treatment of Plaintiffs was wholly different then their treatment of similarly situated facilities, including Dr. Brown and RCA. Accordingly, Plaintiffs' motion for summary judgment as it pertains to Count 1 should be granted. See *901 Ernston Rd., LLC*, *supra*, at p. 14 (sufficient evidence of discriminatory treatment and intent) (Thompson, J.).

### ii.  Disparate Impact

The ADA and RA prohibit municipal decisions that a "disparate impact" on the disabled. 42 *U.S.C.* 3604 (f)(3)(B); *Anderson v. Duncan,* 20 *F. Supp.* 3d 42, 54 (D.D.C. 2013). Courts reviewing

disparate impact claims under the ADA and RA borrow the analytical framework established for review of similar *Title* VII claims. *Lapid-Laurel*, *supra*, at 466. To establish a *prima facie* case predicated upon disparate impact, plaintiffs must show the municipality's action had a greater adverse impact on the protected group than on others, regardless of intent. *Id.* Once a plaintiff establishes that threshold, the burden shifts to the defendant to establish it had a legitimate, non-discriminatory reason for the action and no less discriminatory alternatives were available. *Id.* at 467. Disparate impact is established when the plaintiff shows that outwardly neutral practices have a significant adverse or disproportionate impact on persons with disabilities. *Id.* This does not require any showing of animus or intent. *Oxford House*, *supra*, at 461 n.23. Rather, a plaintiff "need prove no more than that the conduct of defendants actually or predictably results in ... discrimination; in other words, that it has a discriminatory effect... Effect, and not motivation, is the touchstone...." *United States v. City of Blackjack, Mo.*, 508 *F.2d* 1179, 1184-85 (8th Cir. 1974).

By denying approval for a proposed outpatient treatment facility when they had already approved Dr. Brown's operation of an outpatient behavioral health services medical practice in 2018, as well as the earlier approval of a similarly licensed OTP in 2017, Defendants' decisions, both as to the actions of the Township, its Zoning Officer and later through the conduct of the Planning Board has had a greater adverse impact on a protected group, disabled patients suffering from OUD who require Methadone as part of their individual treatment plans.  In light of this clear showing, the burden shifts to Defendants to establish a legitimate, non-discriminatory reason for their actions and, further, that no less-discriminatory alternatives were available.  Which brings us to Defendants' obvious dilemma, they cannot offer *any* legitimate, non-discriminatory reason for their decisions to initially deny Plaintiffs' Zoning Permit Applications or the subsequent Change of Use Review Application, as there is an absolute paucity of evidence to support such a finding.

17

Thus, no rational fact finder could reach any decision but that the Defendants have violated the ADA and Rehabilitation Act with regards to disparate impact.

### iii.  Failure To Provide Reasonable Accommodation

"[T]he ADA and the Rehabilitation Act prohibit all discrimination based on disability by public entities," and "require that covered entities make reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from or to participate in programs run by such entities." *Reg'l Econ. Cmty Action Program, Inc. v. City of Middletown*, 294 *F.3d* 35, 45 (2d Cir. 2002), *superseded by statute on other grounds*, *ADA Amendments Act of 2008*, Pub. L. No. 110-325, 122 Stat. 3553.[7] A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 *CFR* 35.130(b)(7). As applied in connection with land use reviews, municipalities must be cognizant of potential modifications and should "change, waive or make exceptions in their zoning rules," as the United States Circuit Court of Appeals for the Third Circuit recognized in *Hovsons, Inc. v. Township of Brick*, 89 *F. 3d* 1096 (3d Cir. 1996).  A modification or accommodation may be rejected by the municipalities if it is unreasonable. *ReMed Recovery Care Ctrs. v. Twp. of Willistown*, 36 *F. Supp.* 2d 676, 684 (E.D. Pa. 1999) (*citing Hovsons, Inc. v. Twp. of Brick*, 89 *F.3d* 1096, 1104 (3d Cir. 1996)). An unreasonable modification or accommodation is one that (1) imposes an undue financial and administrative burden; (2) would impose undue hardship; or (3) requires a fundamental alteration in the nature of its zoning scheme. *Id.* at 1104.

A public entity may not, in determining the site or location of a facility, make selections:

---

[7] The statutory amendments of 2008 do not supersede the principal holding in *Reg'l Econ. Cmty Action Program, Inc. v. City of Middletown*, 294 *F.3d* 35, 45 (2d Cir. 2002).

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.
28 *CFR* Section 35.130(b)(4).

In so far as the actions of the Planning Board are concerned, municipalities must be cognizant of the potential for modification of existing land use rules and "change, waive or make exceptions" in those rules to accommodate those suffering from recognized disabilities. *Hovsons, Inc. v. Township of Brick,* 89 *F. 3d* 1096, 1098 (3d Cir. 1996). Unreasonable accommodations are those that involve undue financial burdens, undue hardship, or require a fundamental alteration to the proposed program, facility, activity, ordinance, or statute. *Id.* Here, Section 156.018(G) of the Township of Voorhees Land Use Ordinance provides, *inter alia*, in connection with a change of use review, that the Planning Board may condition a change of use approval upon compliance with any reasonable conditions not in violation with the terms of this chapter or other applicable local, state, or federal law, which by definition would include the ADA and RA.

During Affinity's presentation before the Defendant Planning Board, Plaintiffs' counsel, being cognizant of the reasonable accommodation component in the context of the ADA, as well as Section 156.018(G), Plaintiffs' counsel acknowledged the Planning Board's authority to impose a reasonable limitation on the number of patients treated by Plaintiffs. See 4T:129, L5-25. Such a condition, if imposed by the Planning Board, would constitute a reasonable accommodation consistent with the mandate of the ADA and would have addressed "intensity of use" concerns raised during the several hearings.

Affinity's Counsel's closing commentary, along with Affinity's Managing Member's acknowledgement of the Planning Board's authority, provided the Planning Board with a road map

19

to a reasonable accommodation to limit the number of patients that would not fundamentally alter the nature of the service, program, or activity offered by Plaintiffs. Notwithstanding Affinity's acknowledgment of the Defendant Planning Board's authority to impose a limitation on the number of patients, as a reasonable accommodation, in the form of a "reasonable condition" as provided for by *Section* 156.018(G), the "offer" was ignored by the Defendant Planning Board as evidenced by the colloquy between Stuart Platt, Esq., the Board's Solicitor, and Affinity's counsel. See Facts ¶94. Further, Plaintiffs' counsel's attempts to engage in a proper discussion of accommodation, including patient loads and hours of operation, were brushed aside by the Planning Board's Solicitor, as they did not fit the simply a "land use case" narrative the Solicitor was seeking to create. See: 4T:137, L3 – 4T:142, L16.[8]  The decision by the Planning Board Solicitor to ignore the reasonable condition Plaintiffs offered to limit the number of patients was exacerbated by the Solicitor's attempt to limit the disabled patients' treatment options through the limitation of the practice's hours of operation. Giving the nature of the medicine and the patients that are anticipated to be seen at Plaintiffs' OTP, changing the hours of operation would fundamentally alter the functioning of an outpatient opioid treatment program. The reason for providing hours in the morning before 9:00 a.m. is so patients can acquire their necessary lifesaving medication and still report to a regular 9:00 to 5:00 p.m. job. Restricting Plaintiffs' facility to hours that are within 9:00 a.m. to 5:00 p.m., as was advanced by the Board Solicitor, would amount to an unreasonable restriction rather than an accommodation, much less a reasonable one. The attempt to restrict the hours of operation ran directly afoul of the <u>Federal Guidelines For Opioid Treatment Programs</u> issued by SAMHSA, which provides, *inter alia*, the OTP "must [p]rovide services during hours

---

[8] The full exchange between Plaintiffs' counsel and Stuart Platt, Esq., Planning Board Solicitor, appears in Plaintiffs' Reply Brief filed, on September 24, 2021, in connection with the Defendants' opposition to Plaintiffs' motion seeking to deem admitted certain Requests for Admissions.

that meet the needs of the overwhelming majority of patients, which includes hours outside of the traditional 8:00 a.m. to 5:00 p.m. Monday through Friday work schedule." See: Exhibit H, SAMHSA, Federal Guidelines For Opioid Treatment Programs, Facilities *Management*, Page 12, January 2015.

In light of Defendants' failure to provide Plaintiffs with a reasonable accommodation, coupled with the disregard of the accommodation offered by Plaintiffs, the result is that Defendants violated the ADA and Rehabilitation Act.

### B. Defendants Have Violated Plaintiffs Rights To Equal Protection Under the Fourteenth Amendment Through The Selective Enforcement Of Their Land Use Laws

For the reasons discussed more fully below, there are no facts at issue from which a rational factfinder could conclude that Defendants did not violate Plaintiffs rights to equal protection under the Fourteenth Amendment through the selective enforcement of their land use laws. Accordingly, Plaintiffs' motion for summary judgment as it pertains to Count 7 should be granted.

A selective enforcement claim is based on the well-established principle that discriminatory enforcement of a facially neutral law violates the Equal Protection clause of the Constitution. *Thorpe v. Upper Makefield Twp.*, 758 *Fed Appx.* 258 (3d Cir. 2018), *see generally*, *Yick v. Hopkins*, 6 *S.Ct.* 1064 (1885). To succeed on a selective enforcement claim, a party must prove that he was treated differently than similarly situated individuals and that the selective treatment was based on an unjustifiable standard and/or arbitrary factors. *Id.* See also *Village of Willowbrook v. Olech*, 528 *U.S.* 562, 564 (2000). Damages must be awarded when there is evidence to prove selective and discriminatory enforcement of zoning laws. *Gann New Jersey Zoning and Land Use* 6-3.3, Citing *Bennet v. City of Slidell*, 697 *F. 2d* 657, 661 (5th. Cir. 1983).

21

In *Bennett,* damages against the city were awarded to the owner of a lounge in an action brought under 42 U.S.C.A. §1983 alleging that the discriminatory enforcement of a zoning ordinance caused expensive delays in opening his cocktail lounge. 697 *F. 2d* at 658. The city building inspector refused to issue a certificate of occupancy because the owner of the lounge had not paved his parking lot as required by the zoning ordinance. *Id.* The plaintiff pointed out that many other establishments had been permitted to operate with shell-surfaced lots, in violation of the ordinance requirement. *Id.* In defiance of the building inspector, the plaintiff opened the cocktail lounge anyway and the city attorney then wrote to the electric company purporting to authorize the utility to discontinue service to the lounge. Thereafter, the owner paved the lot and received a certificate of occupancy but lost two months business in doing so. 697 *F. 2d* at 659. He sued the city and city attorney to recover damages for the delay. *Id.* The court held that the building inspector applied the ordinance in an unconstitutionally discriminatory manner and thereby violated the plaintiff's due process and equal protection rights. 697 *F. 2d* at 661. The city argued that it should not be held liable on the theory of respondeat superior, but the court observed that the building inspector had been vested with official power to pass upon occupancy permit applications and that it was "precisely within this framework that (he) acted to deny plaintiff his constitutional rights." *Id.* The city attorney was held liable because he was not acting as a prosecutor, legislative counsel or legislator. *Id.* The court sustained the verdict of $20,000.00 damages against the city and $1,000 against the attorney. 697 *F. 2d* at 662.

The Zoning Ordinance adopted by the Defendant Township of Voorhees provides for a series of zoning districts within the municipality. The Defendant Township of Voorhees has established certain "uses" it deems appropriate and permitted for each particular zoning district. Among the aforesaid Zoning Districts is the Office 1 Zoning District. Created pursuant to Section

152.051, the permitted uses within the zoning district are set forth at Section 152.052. Adopted by the Township of Voorhees, on September 13, 1999, Section 152.052, Permitted Uses, provides the following: "(A) Offices of a recognized profession, including but not limited to medicine, social services, finance, accounting, insurance, real estate, law, engineering, architecture and planning, but not to include other licensed professions, such as barbering, general contracting or public movers." (Voorhees Township Ordinance 945-99). The Office 1 Zoning District includes Plaintiffs' property located at 200 West Somerdale Road and RCA's 526 South Burnt Mill Road facility, both within the Defendant Township.

On March 28, 2018, the Township of Voorhees' Zoning Officer issued a Zoning Permit to Plaintiff Dr. Brown, a member of Affinity and its co-Medical Director, authorizing him to operate a "professional office providing behavioral health services on an outpatient basis" from the 200 West Somerdale Road property. See Brown Cert ¶14. In issuing the 2018 Zoning Permit, the then Township Zoning Officer specifically determined that further review by the Planning Board or the Zoning Board was "not applicable" and there were no conditions that Dr. Brown would have to meet prior to opening his medical practice. See Brown Cert ¶15. See also Exhibit E.

On January 10, 2017 Recovery Centers of America (RCA) received an approved Zoning Permit to open an outpatient treatment facility from the 526 South Burnt Mill Road Property. See Martin Cert. ¶43. The proposed use on the Zoning Permit application was "medical/social service office." The description read "Professional Office providing professional services including medical, social services and psychological services on an outpatient basis for individuals suffering from drug and alcohol action." See Exhibit A. In reviewing the application, Zoning Officer Elaine Powell certified that the "storing and dispensing of controlled dangerous substances in the building/facility is a permitted use in this zone [Office 1 Zone]." See Exhibit C. Further, Stuart

23

Platt Esq. and Mario DiNatale met with Powell and they themselves determined that RCA was a medical office and a permitted use in the O-1 Zone. See Exhibit L.  In issuing the 2017 Zoning Permit, no further review by the Planning Board or Zoning Board was necessary and there were no conditions that RCA would have to meet prior to opening up its facility. See Martin Cert ¶42 – 47.

In contrast, Affinity had a much different experience than Dr. Brown had in 2018 and RCA had in 2017 when filing its application, including but not limited to being forced to move ahead with preparation and submission of an application seeking review of a proposed change of use, pursuant to the provisions of Section 156.018, which also includes the mandate of appearing before the Voorhees Planning Board. There is no rational basis for the difference in treatment by the Defendants between Ken Brown, RCA, and Affinity with respect to the selective enforcement of certain land use laws. The decisions made by the Defendants mentioned herein, were irrational and wholly arbitrary. As mentioned throughout this brief, and in Plaintiffs prior pleadings, the only tangible difference between the facilities is that Affinity utilizes methadone, and it is well settled that it is unlawful for a Township to treat a facility different for land use purposes solely because it dispenses methadone. *THW Group, LLC v. Zoning Board of Adjustment,* 86 *A.3d* 330 (Commw. Ct. Pa 2014).[9]

In *THW Group,* the Court found that there is no difference between a medical clinic, medical office, and/or medical center, as all provide treatment to patients, and because the city zoning code specifically permitted the use of properties for the treatment of patients and permits

---

[9] In reaching is decision, the Commonwealth Court discussed the applicability of the Third Circuit's decision in *New Directions Treatment Serv. v. City of Reading,* 400 F. 3d 293 (3d Cir. 2007) and noted the existence of other Federal court decisions on the matter, including: *MX Grp., Inc. v. City of Covington,* 293 *F.3d* 326 (6th Cir. 2002); *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch,* 179 *F.3d* 725 (9th Cir. 1999); and the United States Supreme Court decision in *Sch. Bd. of Nassau County, Florida v. Arline,* 480 *U.S.* 273 (1987).

medical center and medical offices, a methadone clinic must be considered a permitted use. *THW Group, LLC v. Zoning Board of Adjustment*, 86 *A.3d* 330, 332 (Commw. Ct. Pa 2014). In so ruling, the court acknowledged that, although the courts might sympathize with the concerns of the surrounding community, municipalities are not free to apply different zoning standards to methadone clinics. THW sought a zoning use permit to establish a medical office that would dispense methadone for the treatment of patients in the city's commercial district. The facility would operate from 6:00 A.M. to 3:00 P.M. daily and would serve 200 patients per day. Initially, the city issued THW the permit. After the issuance, people in the community were upset and appealed to the zoning board that the facility was not a permitted use in the district. The board agreed with the people, and took back the permit from THW. THW then brought suit against the township. The Court found that the zoning review process is discriminatory where it treats methadone treatment differently from other medical facilities and is thereby unlawful. *THW Group, LLC*, 86 *A.3d* at 342.

There is no logical conclusion other than that the Defendants' selectively enforced the local land use ordinances against Plaintiffs.   They imposed them selectively on Affinity primary, if not solely, because Affinity dispenses methadone. Treating Plaintiffs differently for that reason is unlawful. As evidenced by the aforementioned facts, the conduct during the planning board hearings by the members of the board, and the public, Defendants believe the dispensing of methadone will attract a type of individuals whom they believe to be dangerous and undesirable. Defendants do not want such individuals in their community. A denial predicated on these reasons violates Plaintiffs' rights to equal protection under the Fourteenth Amendment through the selective enforcement of their land use laws.

**C. Defendant Planning Board Violated Plaintiffs Due Process And Equal Protection Rights To A Fair And Impartial Review Of Its Change Of Use Review Application.**

As relates to the state law claims asserted in the Complaint, there are simply no facts from which a rational factfinder could conclude anything other than that Defendant Planning Board violated Plaintiffs' due process and equal protection rights to a fair and impartial review of its change of use review application.

It is a cardinal principal in New Jersey Municipal Land Use Law, *N.J.S.A.* 40:55D-1, *et seq.*, that applicants, as interested parties, have a fundamental right to be heard during hearings before land use boards. *N.J.S.A.* 40:55D-10. Further, New Jersey court decisions have tended more and more to the proposition that land use boards are required to conduct their proceedings akin to the concept of a traditional judicial body. This is consistent with the recognition of the quasi-judicial nature of such boards. Additionally, it has been well-settled for over 30 years, beginning with the United States Supreme Court's decision in *School Bd. Of Nassau County v. Arline*, 480 *U.S.* 273 (1987), that prohibiting the opening of methadone treatment facilities based on "speculative" fears is unlawful. *See* 42 *U.S.C.* § 12101(b)(1). *See, Innovative Health Systems v. City of White Plains*, 117 *F.3d* 37 (2d Cir 1997) ("Although [a city] may consider legitimate safety concerns in its zoning decisions, it may not base its decisions on the perceived harm from . . . stereotypes and generalized fears."). Rather, the evidence must establish that an individual does, in fact, pose a significant risk, a risk of serious nature. *See*: *901 Ernston Rd., LLC v. Borough of Sayerville Zoning Bd. Of Adjustment*, Civ. No. 18-2442, 2018 WL 2176175 at *6 (D.N.J. 2018) (evidence of intentional discrimination shown by board members' potential animus towards recovering addicts and associations with criminal behavior) (Thompson, J.).

At the outset, it must be noted that Defendants, perhaps unwittingly, have admitted that there were communications involving Planning Board members, wherein information was shared or disseminated with two (2) Board members outside of the four (4) Planning Board Meetings and which were not disclosed to Plaintiffs during the meetings. Pursuant to the New Jersey <u>MLUL</u>, all discussions, presentations of evidence, questions, and comments with regard to a pending application must be done on the record. *N.J.S.A.* 40:55D-10f. As the New Jersey Superior Court, Appellate Division has opined: land use board members should not "engage in *ex parte* discussions with interested parties concerning the merit or lack or merit of a particular application." *Smith v. Fair Haven Zoning Bd.,* 335 *N.J. Super.* 111, 120 *(*App. Div. 2000).   Any such exchanges occurring during the pendency of Plaintiffs' application would, therefore, be are improper. Defendants have disclosed in this litigation five (5) exchanges of email communications, totaling 13 separate emails, during the pendency of the application wherein the Planning Board Chairman Schwenke and Board member DiNatale were recipients.  Further, among the authors of these emails were the Township's Administrator, and Jaclyn Bradley, the Defendant Zoning Officer: neither of whom appeared before the Planning Board as witnesses.  Additionally, Defendants disclose and admit that the Bradley authored emails discussing the pending "Affinity Application."[10] The existence of these improper email exchanges is, in and of itself, undeniable evidence that Defendants violated the provisions of the New Jersey MLUL, Chap. 40, sec. 55 D-37 and denied Plaintiffs their right to due process, in clear violation of the law and statute.

Further evidence of Defendants' conscious disregard of Plaintiffs' rights to due process and equal protection is on full display in the video recordings of the four (4) Planning Board hearings.  Even a casual viewing of the video recordings establishes the egregious manner in which

---

[10]  See: Exhibit I, Defendants' Privilege Log Items 97-98, 109, 110-116, 117, and 132-333.

the Defendant Board went about its business of trampling Plaintiffs' rights. The behavior of The Planning Board Members, as evidenced by their of-record attitude and demeanor were so hostile as to be shock the conscience, and the members unchecked remarks reflected their unsubstantiated, groundless and unscientifically supported beliefs regarding opioid treatment facilities and patients suffering from OUD, as well as Defendants' clear bias against those disabled patients seeking treatment for OUD and their treatment providers. See: 42 *U.S.C.* § 12101(b)(1); See also: *Innovative Health Systems v. City of White Plains*, 117 *F. 3d* 37 (2d Cir 1997) ("Although [a city] may consider legitimate safety concerns in its zoning decisions, it may not base its decisions on the perceived harm from . . . stereotypes and generalized fears."); *Helping Hand, LLC v. Baltimore County, MD*, 515 *F. 3d* 356, 366 (4th Cir. 2008).

These beliefs and remarks flew in the face of science-based facts surrounding opioid addiction treatment. The science was attempted to be testified to by Plaintiffs, however the Board found such testimony to be irrelevant – more on this below. Moreover, the public comment and emails reflected that the residents of Voorhees are largely misinformed and fearful of Plaintiffs' facility and patients; these speculative fears were echoed by Members of the Planning Board in their own testimony. (3T:26, L1-11); (3T:52, L15-18); (3T:78-79, L1-25); (3T:77, L1-25); (3T:77, L12-18); and (3T:83, L7-18).

Prior to the Planning Board Meetings, residents of Voorhees Township wrote emails to the Township. These emails exhibited prejudice against disabled persons, dealt in impermissible stereotypes, raised unfounded fears, and speculated as to decreased property values.[11] Importantly, these email communications were distributed and circulated among the Planning Board's members in violation of Plaintiffs' statutory right to cross examine all witnesses. See:

---

[11] See: Exhibit J. See also: 1T:30, L16 to 1T:33, L23 (Plaintiffs' counsel's request for production of the email communications.)

N.J.S.A. 40:55D-10d.  See also: *Seibert v. Dover Tp. Bd. of Adj.*, 174 *N.J. Super.* 548 (Law Div. 1980) (an applicant should not be deprived of his right to confront a person or a group of persons who set forth arguments why the application should be denied).

The proceedings before the Defendant Planning Board were punctuated by repeated episodes of improper, unsubstantiated, misinformed, and disparaging comments by members of the Board.  It was not at all uncommon for a Board member to make pejorative comments concerning Plaintiffs' facility, their anticipated patients, and how opioid treatment facilities operate generally.  Planning Board Member Mario DiNatale, inquired about Plaintiffs' patients receiving methadone treatment via intravenous needles. (3T:26, L1-11).  During the Planning Board meeting of September 23, 2020, Board Members Anthony Nicini and Jason Ravitz raised a joint question concerning security predicated upon testimony "based on the type of drugs dispensed and clients being served." (3T:52, L15-18). During the Planning Board meeting of September 23, 2020, Board Member Anthony Nicini stated that the chances of addicted persons causing trouble with kids and the community is more likely than with non-addicted persons. (3T:79, L16-21). During the Planning Board Meetings, Board Member Anthony Nicini asked Ron Martin "Wouldn't you rather have it [the facility] in an area where there were no children?" (3T: 77, L1-25). During the Planning Board meeting of September 23, 2020, Board Member Anthony Nicini stated that "… there are other areas that are – you wouldn't have been asked all these questions, where there wouldn't have been much concern." (3T:77, L12-18).  At the meetings, Planning Board Member Anthony Nicini inquired into whether Affinity's patients are "pedophiles" and if that had been considered by Plaintiffs in opening their facility in close proximity to an elementary school. See: 3T:83, L17-18. At the meetings, Planning Board Member Jason Ravitz testified that it is "well documented" that drug dealers are drawn to areas where

29

facilities like Plaintiffs are located because they want to "prey" on patients receiving treatment. (3T:53, L1-22).   That these comments were acceptable to the Board and intended to be communicate derogatory and patently unsubstantiated information is the fact that the Board's Solicitor, knowing of the improper nature of the commentary sat mute and offered no cautionary instructions to the members of the Defendant Board.

To understand the scope of due process and equal protection violations engaged in by the Defendant Planning Board, as evidenced by the unprofessional behavior of the individual Planning Board Members, the Court need look no further than this behavior during the hearing of August 26, 2020.   Examples of disinterest and disregard include and are not limited to, Board Member Jason Ravitz stepping away from his computer screen,  (See: August 26 video, timestamp 3:29); Board Member David Kleinman operating a motor vehicle throughout the meeting, (See: August 26 video);  Board Member Mark Kleinman eating food (See: August 26 video, timestamp 4:49); Board Member Mark Kleinman stepping away from his computer screen, (See: August 26 video, timestamp 22:15); Board Member Jason Ravitz eating food, (See: August 26 video, timestamp 13:15); Board Member David Kleiman engaging in conversation with an unidentified individual off screen who was not participating in the meeting, (See: August 26 video,  timestamp 51:00); Board Member David Kleiman stepping away from his computer screen, (See: August 26 video, timestamp 53:00); and Board Member Troy Brocco watching television, (See: August 26 video, timestamp 1:03).

During the public comment portion of the Planning Board hearings before the Voorhees Township Planning Board, eight (8) members of the public were permitted to offer speculative,

biased, and factually unsupported comments on the merits of Affinity's change of use review

application. The tenor of the testimony included opposition[12]:

1. Due to the practice's proximity to an elementary school and apartment complex (Lynn Thistle - 4T:10, L22 to 4T:12, L13);
2. Based upon the speculative impact of the practice on the clean, safe, desirable place to live (Dr. Erica Casella – 4T:14, L1-4;
3. Predicated upon a presumed negative impact on property values and dissuading families from moving into the neighborhood (Dr. Erica Casella - 4T14, L25 to 4T:15, L4);
4. Due to the dangerous condition created by the presence of methadone-treated, dizzy drivers on the roads (David Glowacki - 4T33, L9-16);
5. Due to the presence of patients exiting the practice being dizzy or not a hundred percent clear with themselves (Dennis Lafferty - 4T67, L18 to 4T:68, L3); and
6. Because people will be leaving with an opiate in their pocket within a thousand feet or so of the school (Margo Orlin - 4T:48, L24 to 4T:49, L1).

While the bulk of the public comment focused on speculative concerns, one speaker's

testimony stood out for his characterization of Affinity as an accomplice to criminal activity.

David Glowacki was allowed to offer the following:

> It's also been proven that methadone clinics attract heroin addicts and drug dealers who sell illegal drugs to them. So, in effect, Affinity is purposely drawing illegal drug deals to within a thousand feet of our school. It sounds as if Affinity Healthcare is knowingly more of criminal accomplice than anything. Is it Affinity's goal to attract future businesses- future business by targeting preschool to fifth grade children? … We don't want an affinity of junkies drawn to our school. We don't want an affinity of drug dealers drawn to our school. We don't want an affinity of deception from Affinity Healthcare … a medical office is simply not the same as a methadone clinic. 4T:34, L3 to 4T:35, L16.

In the face of this outrageous and totally factually unsupported and inappropriate comment,

the Planning Board Solicitor, as he did with each of the public commentators, stood mute and

failed to caution the Board.

In the absence of any cautionary instruction by their Solicitor, the Planning Board

members, in addition to voicing their own discriminatory views, permitted and took into

---

[12] Additional public comment/testimony can be found at 4T:14, L21-24; 4T:58, L15-17; 4T:60, L11-12; 4T:60, L13-18; 4T:11, L19 to 4T:12, L1; 4T:14, L4-12; and 4T:11, L13-18.

consideration, supported, perpetuated, and echoed the Voorhees residents' impermissible commentary regarding disabled individuals.  One glaring example of this echoing of the speculative fears of the public, occurred when Board Member Jason Ravitz, the Township's Deputy Mayor, undertook an internet search in hopes of validating residents' misinformed statements regarding methadone patients' ability to drive after receiving medication. See: 4T:29, L20 -25; 4T:30, L1-3.  The Fourth Circuit has held that "community views may be attributed to government bodies when the government acts in response to these views." *Helping Hand, LLC v. Baltimore County, MD*, 515 *F. 3d* 356, 366 (4th Cir. 2008).

As identified above, Dr. Erica Casella testified as to her opinion as to the ability of patients to drive after receiving Methadone treatment due to dizziness.[13]  In response to a Board member's question, Ron Martin attempted to explain the issue of side effects and Affinity's procedures, but was interrupted by Deputy Mayor Ravitz, who testified:

> Can I just add, since Mr. Martin did not answer the Chair's question. There's a web site I quickly punched up, RXlist.com. Major hazards of methadone are respiratory depression, and to a lesser degree, systemic hypotension. Respiratory arrest, shock, cardiac arrest, and death have occurred. The most frequently observed adverse reactions include light-headedness, dizziness, sedation, nausea, vomiting and sweating. 4T:29, L20 to 4T:30, L3.[14]

Thus, along with their own misinformed views, the Planning Board felt obligated to represent and perpetuate the publics' views and were responsive to their egregious discriminatory commentary.  Mr. Ravitz's testimony reinforced the community members' prejudices and stereotypes. Moreover, when Plaintiffs' counsel pointed out Ravitz's "highly inappropriate" action and commentary as being improper, the Board Chairman and Planning Board Solicitor ignored the

---

[13] Plaintiff's counsel endeavored to explore the basis of Dr. Casella's opinion through cross-examination; he was improperly prevented from do so by the Planning Board's Solicitor.  See: 4T:22, L6-18; 4T:24, L1-22.
[14] The entire exchange appears at 4T:19 to 4T:31.

objection. 4T:30, L7-9.   Plaintiffs' counsel was not afforded an opportunity to cross examine Mr. Ravitz.

The Defendant Planning Board's animus towards Plaintiffs was also on full display with respect to Plaintiffs' attempts to present expert testimony on the "medical" issues.  Simply stated: the Defendant Board, abetted by its Solicitor, made a mockery of Plaintiffs' attempts to address the issues raised by the Board and its engineer.[15]  Plaintiffs' repeated efforts to address what were identified by the Board Engineer as critical issues were hindered and thwarted by the improper objections and hurdles erected by the Planning Board's Solicitor.  As a result of these objections and improperly deeming Plaintiffs' testimony irrelevant, Plaintiffs' presentation was gutted and the resulting testimony of Plaintiffs' experts was ignored and disregarded by members of the Defendant Planning Board. The Board, directly and through its Solicitor, did not have cause to find that any testimony presented by or on behalf of Plaintiffs was "unbelievable, incompetent, or conflicting.

While a planning board may reject testimony, it may not do so unreasonably, based only upon bare allegations or unsubstantial beliefs." *New York SMSA v. Bd. Of Adj.*, 370 *N.J. Super.* 319, 338 (App. Div. 2004). Moreover, "where an applicant has supported all aspects of the application with the testimony of experts ... denial of the application by the Board based solely on ... lay testimony cannot overcome the positive testimony of experts. *Id.*  See also, *Riya Finnegan v. South Brunswick*, 197 *N.J.* 184, 192-193 (2008) (local government action cannot be based on mere sentiments); *Cell S. of NJ v. Zoning Bd. Of Adjustment*, 172 *N.J.* 75, 88, 796 (2002) (Boards must root their findings in substantiated proofs rather than unsupported allegations). In fact, the New Jersey Supreme Court has made clear that a board decision lacking substantive support must

---

[15] At the outset of his March 6, 2020 review letter, Rakesh Darji, the Board Engineer, wrote that the Applicant should be required to present testimony as to the medical nature of the practice. See: Exhibit M.

lead to a finding that the board action was, by its nature, arbitrary and capricious. *Riya Finnegan,*
*supra.*

Here, Plaintiffs presented expert testimony from physicians specializing in the outpatient treatment of patients suffering from OUD. See: 2T:36, L9-10; 3T:133, L17-18. The testimony was intended not only to address the Board Engineer's March 6, 2020 report, but also to provide correct information to the Board and the Voorhees community as to the nature of an OTP's medical practice and those suffering from OUD.  Plaintiffs were well-aware, through review of social media postings that residents of Voorhees Township were misinformed both as to the nature of an OTP and its patients.  The postings expressed speculative and unfounded beliefs regarding individuals suffering from OUD and what an outpatient treatment facility, like Plaintiffs, would do to the community. See:  Martin Cert. ¶35; Exhibit N[16]

In denying Plaintiffs' application, the Board and its Solicitor:

1. Ignored the unrefuted testimony from Plaintiffs' experts;
2. Ignored the supporting and explanatory evidence presented to each Planning Board Member prior to the several hearings;[17] and
3. Determined during the hearings that Plaintiffs' expert testimony was irrelevant and should not be considered in making the decision on Plaintiffs' application because this is "a land use matter".[18]

### D.  Defendant Planning Board's Decision To Deny Plaintiffs' Application Was Arbitrary And Capricious

The "scope of review of an administrative decision 'is the same as that [for] an appeal in any non-jury case, i.e., 'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record.'" *In re Taylor,* 158 *N.J.* 644, 656 (1999) (citations omitted). "It is well established that when a reviewing court is considering an appeal from an action

---

[16] Plaintiffs' counsel attempted to place the Plaintiffs' presentation to the Board in context; he was unsuccessful. See: 1T:62, L1-20 and 2T:29-32.
[17] See: Exhibit O, the binder of supporting and explanatory materials presented to the Board prior to the hearings.
[18] See: Transcript of the Board proceedings of 2T:60, L7-25; 3T:147, L8-24; 3T:150, L23-25.

taken by a planning board, the standard employed is whether the ... denial was arbitrary, capricious, or unreasonable." *Fallone Properties. L.L.C. v. Bethlehem Tp. Planning Bd.*, 369 *N.J. Super*. 552, 560 (App. Div. 2004).

The term "arbitrary and capricious" embraces a concept which emerges from the due process clause of the Fifth and Fourteenth Amendments of the federal Constitution and operates to guarantee that acts of government will be grounded on established legal principles. *Bayshore Sewage Co. v. DEP*, 122 *N.J. Super*. 184, 189 (Ch. Div. 1973), *affd*, 131 *N.J. Super*. 37 (App. Div. 1974). Arbitrary and capricious means "willful and unreasoning action, without consideration and in disregard of circumstances." *Id.* While the factual determinations of the planning board are presumed by the Court to be valid, the Court will not "rubber-stamp" findings that are not reasonably supported by the evidence. *Chou v. Rutgers*, 283 *N.J. Super*. 524, 539 (App. Div. 1995), *certif. denied* 145 N.J. 374 (1996). Rather, it is essential that the board's findings be grounded in evidence in the record. *Fallone Properties. L.L.C. v. Bethlehem Tp. Planning Bd.*, *supra*, at 562, citing *Tomko v. Vissers*, 21 *N.J.* 226, 239-240, (1956), and *Smith v. Fair Haven Zoning Bd. of Adjustment*, 335 *N.J. Super*. 111, 120 (App. Div. 2000).

As stated in more detail below, the Board's decision with respect to Plaintiffs' Application is not supported by the record here, and the denial is contrary to law. Defendants can point neither to any statutory or local ordinances that authorized the Planning Board to strike out on its own to create a fictional basis justifying denial of Plaintiffs' application. Not only was the Defendant Board's action arbitrary and capricious, it was by its very nature an unauthorized exercise of its powers. Regardless of how viewed the Defendant Planning Board's action cannot be permitted to stand.

35

In this case, there was no such authorization for the drastic action taken by the Board in denying Plaintiffs Application. Rather, it is apparent from a review of the record and the after-the-fact Resolution that the Board based its decision upon a manufactured distinction between what constitutes a medical office versus a medical clinic in an undeniable effort to cover up their discriminatory attitudes and beliefs against facilities like Plaintiffs and the disabled patients they treat. Plaintiffs proposed utilization of the units located at 200 West Somerdale Road as an outpatient treatment center is permitted in the Office-1 Zoning District. Plaintiffs sought nothing more than that which is permitted by the zoning ordinance. *See: Voorhees Township Zoning Code* 152.052. The permitted uses in the O-1 Zone are "offices of a recognized profession, including but not limited to medicine, social services, finance, accounting, insurance, real estate, law, engineering, architecture and planning, but not to include other licensed occupations, such as barbering, general contracting or public movers.[19] See: *Ordinance Section* 152.052. Thus, the property to be utilized for Plaintiffs' practice is zoned for the exact type of medical facility Plaintiff proposed – a medical facility that provides an outpatient treatment program to those suffering from OUD. That Plaintiffs' proposed use was, in fact, a permitted use is confirmed by the issuance of the initial 2018 Zoning Permit to Dr. Brown by then Zoning Officer Elaine Powell. The permitted nature of the use is further supported by the 2017 issuance of a Zoning Permit to RCA for an OTP also located within the Zone. Here, however, the Defendant Board, led by the very individuals who had approved of the issuance of the RCA Zoning Permit in 2017, determined that an OTP is not a medical office, but, rather, a "medical clinic." See: 4T:146, L20 to 4T:147, L25; 4T:153, L4-14; 4T:159, L1-9.

---

[19] MAT is a recognized activity by the CDC, the FDA, and the NJ DOH, which is part of the recognized profession of medicine.

As a result of the slight-of-hand engaged in by Board Member DiNatale and the Board Solicitor, the Defendant Planning Board failed to consider that:

1. Plaintiffs' proposed use was expressly permitted within the Office-1 Zoning District, pursuant to the Township Zoning Ordinance;
2. A separate OTP (RCA) had been approved in 2017 without the need for any Board review; and
3. The Zoning Officer who issued RCA its Zoning Permit in 2017 had determined that Plaintiffs' proposed use was permitted at the time she issued Dr. Brown's Zoning Permit in 2018.

Instead, the Defendant Planning Board exercised authority it did not possess. *N.J.S.A.* 40:55D-62, Power to zone, provides that "[t]he governing body may adopt or amend a zoning ordinance." *N.J.S.A.* 40:55D-62a. It was not for the Defendant Planning Board to create a definitional distinction between medical offices, practices, and clinics. By doing so, the Defendant Board usurped the power of the Voorhees Township Council.

It is admitted by Defendants that the Voorhees Township Zoning Ordinance does not include a definition of "clinic" or "medical clinic". See: Exhibit PP, Defendants Responses To Plaintiffs' Request For Admissions ¶6 – 7. Nor, for that matter, has the Voorhees Township Committee provided a definition as to what constitutes a does "medical office." The Defendant Planning Board was not free to create any distinctions to fill any perceived vacuum created by the Township Committee failure to provide definitions. While a planning board has jurisdiction to interpret zoning ordinances, it may only do so within the scope of the language of the ordinance itself. While it may limit the scope of permitted uses to, among others, medical offices, it may not arbitrarily impose a prohibition upon "clinics" unless the restriction is grounded in the language of the Ordinance. *Fallone Prop. v. Bethlehem Plan. Bd.*, 369 *N.J. Super*. 552, 566-67 (App. Div. 2004). The restriction is not only not so grounded; it does not exist.

The lack of a distinction in the Voorhees Township Zoning Ordinance is consistent with the terms "medical clinic" and "medical office" which are used as equivalents in general usage. *Merriam Webster Dictionary*[20] provides five alternative definition of "clinic," including *inter alia*: "a facility (as of a hospital) for diagnosis and treatment of outpatients" and "a group practice in which several physicians work cooperatively." *Dictionary.com* provides similar definitions for the word "clinic," including, inter alia, "a place, as in connection with a medical school or a hospital, for the treatment of nonresident patients, sometimes at low cost or without charge" and a group of physicians, dentists, or the like, working in cooperation and sharing the same facilities."[21] None of these definitions alter the essential equivalency of a "medical office" and "medical clinic." The case law is consistent with this understanding. See: *L&L Clinics, Inc. v. Twp. Of Irvington*, 189 *N.J. Super.* 332 (App. Div., *certif. denied*, 94 *N.J.* 540 (1983).

In *L&L Clinics*, the plaintiff, a physician and the sole owner of the applicant, had obtained a Certificate of Need from the State in accordance with *N.J.S.A.* 26:2H-1, *et seq.*[22] As germane to the instant matter, the Appellate Division of the Superior Court looked to a Superior Court Law Division decision for guidance: *Scerbo v. Orange Bd. Of Adj.*, 121 *N.J. Super.* 378, 393 (Law Div. 1972). *Scerbo* held that a residential narcotic rehabilitation and treatment center was an "institutional" use under the local zoning ordinance. This suggested to the *L&L Clinic* court that a "nonresidential outpatient treatment facility" was "more similar to ... a professional office" than to a hospital or institution. 189 *N.J. Super.* at 338.

The *L&L Clinic* court concluded:

---

[20] https://us02web.zoom.us/j/82107420642
[21] https://www.dictionary.com/browse/clinic#
[22] At the time of *L&L Clinics* the state licensing requirement included possession of a Certificate of Need. That requirement has since been eliminated. The State requirement applicable to the instant matter was the inclusion of language on the local zoning permit reflecting the facility was operating an Opioid Treatment Program. It is this requirement that led to Plaintiffs filing for an amended zoning permit in November, 2019.

Dr. LaMorgese's proposed clinical facility is more rationally categorized within conventional understanding as a "personal service use ... similar in nature to ... a professional office" under § 608.1–1(w), than within the conventional understanding of a "hospital" use requiring a special permit. *L&L Clinics*, *supra*, 189 *N.J. Super.* at 338.

Whether Plaintiffs' proposed use as an opioid treatment program is the same as or closer to a medical office than to the undefined "medical clinic" is for all purposes irrelevant, as there is no essential difference between the two terms. A doctor's office does not become a hospital simply because the Defendant Planning Board wishes it were so. It follows that a medical office does not become a medical clinic simply because a planning board latches onto the concept as a way to deny the operation of an otherwise permitted use, as occurred here. This view is consistent with that taken by the Third Circuit. See: *Bruni v. City of Pittsburgh*, 824 *F.3d* 353, (3rd Cir 2016) (no distinction is drawn between a "medical office" and a "medical clinic.")

Accordingly, Defendant Planning Board, in making its decision that Plaintiffs' OTP is not a permitted use in the Office-1 Zoning District, relied exclusively on the arbitrary and capricious reasoning that Plaintiff's facility is a "medical clinic" rather than a "medical office," a position devoid of any factual or legal support.

### E. Defendants Violated The New Jersey Law Against Discrimination By Denying Plaintiffs' Zoning Permit Applications and Change of Use Review Application In Contravention Of The New Jersey Municipal Land Use Law And Based Upon Improper Discrimination Against Plaintiffs And Their Prospective Patients.

The New Jersey Law Against Discrimination ("NJLAD"), *N.J.S.A.* 10:5-1 *et seq*, prohibits a "municipality, county or other local civil or political subdivision of the State of New Jersey, or an officer, employee, or agent thereof to exercise the power to regulate land use or housing in a manner that discriminates" on the basis of disability. *N.J.S.A.* 10:5-12.5; See also: *Hansen Foundation, Inc. v. City of Atlantic City*, 504 *F. Supp.* 3d 327, 342 (D.N.J. 2020). Disability is defined as including:

physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness" or "any mental, psychological or developmental disability ... resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically." *N.J.S.A.* 10:5-5(q).

This definition has been construed by the courts to include individuals suffering from substance dependence. *Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp.*, 455 *F.3d* 154, 156 n.5 (3d Cir. 2006). Like the ADA, the NJLAD was enacted to protect the rights of those with disabilities and to enable them to vindicate those rights in court. See: 42 *U.S.C.A.* 12102(1)(A) and *N.J.S.A.* 10:5-1 *et seq.*

For the same reasons set forth throughout this brief, the Defendants behavior towards Plaintiffs beginning on or around November 12, 2019 and continuing thereafter was blatantly discriminatory towards Plaintiffs and their prospective patients and, as such, violated the NJLAD. There is no question that the Defendants have exercised the delegated powers to regulate land use in a way that discriminates against disabled persons, without justification or cause, thereby preventing the opening of an outpatient healthcare treatment program necessary for their treatment and rehabilitation. There are no facts at issue from which a rational factfinder could conclude that Defendants' behavior directed towards Plaintiffs was anything other than flagrant discrimination practiced against Plaintiffs and their prospective patients in violation of the NJLAD.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, the Plaintiffs Affinity Healthcare Group Voorhees, LLC, and Dr. Kenneth Brown's motion for Summary Judgment should be granted.

Dated: December 31, 2021
Willingboro, New Jersey

HELMER, CONLEY & KASSELMAN
Samuel Reale Jr., Esq.
*Attorney for Plaintiffs*

40