[Docket Nos. 74, 86]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| AFFINITY HEALTHCARE GROUP VOORHEES, LLC and DR. KENNETH BROWN, | |
| Plaintiffs, | Civil No. 21-800 (RMB/AMD) |
| v. | |
| | **OPINION** |
| THE TOWNSHIP OF VOORHEES, *et al.*, | |
| Defendants. | |

**APPEARANCES**
Samuel Reale, Jr., Esq.
Helmer, Conley & Kasselman, P.A.
600 Beverly Rancocas Rd.
Willingboro, NJ 08046

*On behalf of Plaintiffs*

Christopher J. Norman, Esq.
Stuart A. Platt, Esq.
The Platt Law Group, P.C.
40 Berlin Ave.
Stratford, NJ 08084

J. Brooks Didonato, Esq.
John C. Gillespie, Esq.
Parker McCay, P.A.
9000 Midlantic Dr., Suite 300
Mount Laurel, NJ 08054

John C. Grady, Esq.
Cockerill, Craig & Moore, LLC
58 Euclid St.

Woodbury, NJ 08096

    *On behalf of Defendants*[1]

**BUMB, U.S. District Judge**

    Federal courts should not be converted into super zoning tribunals, and an aggrieved zoning applicant should not be permitted to appeal an unfavorable zoning decision by a municipal zoning board thereto absent some legitimate federal claim. At the same time, zoning decisions motivated by discriminatory animus towards any legally protected group, including persons with disabilities, violate federal anti-discrimination laws. This Court is being called upon to determine whether the Township of Voorhees violated such laws, among others, when it denied the plaintiffs' request for a zoning permit to operate an opioid treatment program at a specific location within the Township.

## I.    FACTUAL BACKGROUND

    The parties have submitted extensive statements of material fact in support of their pending cross motions for summary judgment. The below facts are generally not in dispute unless so specified.

### A.    The Parties

    Co-plaintiff Affinity Healthcare Group Voorhees, LLC (hereafter, "Affinity") provides a range of outpatient treatment services to individuals suffering from opioid

---

[1] Mr. Stuart A. Platt, Esq., is not appearing on behalf of the Township of Voorhees. [Docket No. 10.] Otherwise, all defense attorneys who have entered a notice of appearance on the docket represent all named defendants.

use disorder. [Docket No. 74-1 ("Plaintiffs' SMF") ¶ 2.] Affinity's treatment options for a particular patient may include medication-assisted treatment, such as dispensing an approved opioid agonist treatment medication like methadone or buprenorphine. [*Id.* ¶¶ 2, 6.] Affinity is a New Jersey limited liability corporation, and during the relevant period for the present lawsuit, Affinity's membership included co-plaintiff Kenneth Brown, M.D. ("Dr. Brown," and together with Affinity, "Plaintiffs"), who then served as Affinity's co-Medical Director. [*Id.* ¶ 1.] Plaintiffs were ultimately unsuccessful in obtaining the requisite local zoning approvals to operate an opioid treatment program in a leased facility at 200 West Somerdale Road in the Township of Voorhees, New Jersey. [*Id.* ¶ 11.]

Plaintiffs brought this suit against the following named defendants: the Township of Voorhees ("Voorhees" or the "Township"), the Voorhees Township Zoning Board (the "Zoning Board"), Township Zoning Officer Jaclyn Bradley ("Bradley"), and the Voorhees Township Planning Board (the "Planning Board," and collectively with Voorhees, the Zoning Board, and Bradley, "Defendants"). Plaintiffs' primary contentions are that in denying their zoning permit applications, Defendants violated federal and state laws prohibiting discrimination on the basis of disability—that of Plaintiffs' prospective patients who are persons recovering from opioid addiction—as well as Plaintiffs' rights to substantive due process, equal protection, and under various other state laws governing municipalities and their relevant zoning authorities.

**B.     The Township's O-1 Zone; Applying for a Change of Use and/or Use Variance**

Like most municipalities, the local zoning ordinance of Voorhees creates a series of zoning districts, and each district has permitted uses pre-authorized by the Township. [*Id.* ¶ 14.] The facility Affinity leased is located within the "Office-1" or "O-1" zoning district. [*Id.* ¶ 13.] The applicable section of the Township Code, Section 152.052(a), outlines the below permitted uses for the Township's O-1 zoning district:

> Offices of a recognized profession, including, but not limited to medicine, social services, finance, accounting, insurance, real estate, law, engineering, architecture and planning, but not to include other licensed occupations, such as barbering, general contracting, or public movers.

Voorhees, N.J., Township Code § 152.052(a) (June 14, 2021).[2] The Township Code further provides that "[t]he purpose and intent of the O-1 Office Zone is to provide for office uses on small lots and which shall create a transition zone between residential uses and more intensive commercial or industrial uses." *Id.* § 152.051.

When petitioning for a change of use with respect to a particular property's immediately prior use, the Township Code provides detailed procedures applicants must follow to obtain Planning Board review:

> (A) A zoning permit and certificate of conformance must be obtained for every change of use of any non-residential premises, whether due to the sale of the entire premises or change in tenant or occupant of all or any portion of the premises, unless the new owner/tenant/occupant will continue the exact same use or extremely similar to the immediate prior use.

---

[2] Although not relevant to the present action, the Township Code also authorizes "[b]anks chartered under state or federal law" as another permitted use for the O-1 zone. *Id.* § 152.052(b).

(B) The applicant must comply with § 156.010 of this chapter regarding requirements for notice of public hearings.

(C) In order for the reviewing board to determine if the existing site conditions will support the new use, the applicant must submit along with the change of use application, at a minimum, a copy of the most recently approved site plan for the property. . .

(D) The Planning Board may waive the requirement for a full site plan review submission if the construction or alteration or change of occupancy or use does not affect existing circulation, drainage, relationship of buildings to each other, landscaping, buffering, lighting and other considerations of site plan review.  The applicant must comply with § 156.019 below for any request for a site plan waiver.

(E) The Planning Board will then conduct a public hearing on the proposed change of use application.  The applicant will be responsible to clearly state all aspects of the proposed use of the property.

(F) The reviewing board shall take action on a change of use application within 45 days after the application has been certified complete or within such further time as may be consented to by the applicant.  The reviewing board will make a final determination on the application and plan based on the testimony provided to the reviewing board.  Failure of the reviewing board to act within the prescribed time period shall constitute approval of the application.

(G) The reviewing board may condition a change of use approval upon compliance with any reasonable condition not in violation with the terms of this chapter or other applicable local, state, or federal law.

*Id.* § 156.018.

New Jersey law further requires municipalities to establish a Zoning Board of Adjustment and authorizes such bodies to issue a "use variance" for a particular property if certain requirements are met, permitting the use of the property to vary from those permitted uses specified in the Township Code by zone. N.J.S.A. § 40:55D-70.

### C.   Recovery Centers of America Operates an Opioid Treatment Program in the O-1 Zone; RCA's Facility Versus Plaintiffs' Proposed Facility

Plaintiffs emphasize that another entity, Recovery Centers of America ("RCA"), operates an opioid treatment program in Voorhees within the Township's O-1 zoning district. [Plaintiffs' SMF ¶ 16.] RCA's opioid treatment facility is located across the street from a daycare center, which relates to concerns raised regarding the location of Plaintiffs' proposed facility near an elementary school and daycare. [Docket No. 74-2 (hereafter, "Plaintiffs' Brief"), Ex. J.] Defendants admit that— unlike Plaintiffs—at no point during the zoning permit application process was RCA ever required to seek a change of use from the Planning Board (or a use variance from the Voorhees Zoning Board of Adjustment), to appear before the Planning Board, or to provide a traffic study in support of its zoning permit application. [Docket No. 86-1 ¶¶ 18–19, 21.]

Defendants maintain that a comparison of Plaintiffs' proposed facility and RCA's facility is like comparing apples-to-oranges because RCA operates as a stereotypical medical office while Affinity seeks to operate a facility more akin to a medical clinic. [Docket No 86-2 (hereafter, "Defendants' SMF") ¶¶ 28, n. 1; 50.] According to Defendants, Plaintiffs' proposed facility and RCA's facility employ "two completely different treatment models" and "that difference is significant in terms of the impact each has upon parking, traffic patterns and other related zoning issues." [*Id.* ¶ 28, n. 1.]

On January 10, 2017, RCA representatives met with Zoning Officer Elaine

6

Powell and Planning Board Member Mario DiNatale to review its zoning permit application. [Plaintiffs' SMF ¶ 22.] Afterwards, Ms. Powell and Mr. DiNatale met with the Planning Board Solicitor, Stuart Platt, Esq., to review RCA's application; in connection with such review, Ms. Powell handwrote a note on RCA's application that "[a]fter reviewing w/ Stuart Platt, use is a permitted use under Office-1 Zone. Counseling/medical office as listed under O-1." [*Id.* ¶ 23 (citing Plaintiffs' Brief, Ex. L).] The zoning application submitted by RCA also stated that RCA's proposed use was to be "Professional Medical and Social Service Office." [*Id.*] The resulting approved zoning permit issued to RCA describes the proposed use as "Professional Office providing professional services including medical, social services and psychological services on an outpatient basis for individuals suffering from drug and alcohol addiction." [Plaintiffs' Brief, Ex. A.]

RCA schedules patient care services from 10:00 A.M. to 3:00 P.M., Mondays through Fridays, for both in-person and telehealth appointments. [Defendants' SMF ¶¶ 39–40.] Intensive and general outpatient services are also provided by RCA during regular business hours during the workweek, on Saturdays, and during extended hours in the evenings during the workweek. [*Id.*] RCA patients typically begin their treatment with detox, followed by 24/7 in-patient care, and are also provided with what it calls "After Care," a long-term recovery support network. [*Id.* ¶¶ 45–48.] Although RCA also provides medication-assisted treatment, Defendants emphasize that RCA utilizes a different operating model for its treatment facility by "provid[ing] a comprehensive overall approach to treatment, not simply a daily dosage of

narcotics." [*Id.* ¶ 49.]

By contrast, Plaintiffs' primary witness before the Planning Board, Ronald Martin ("Martin"), testified that most visits by Plaintiffs' anticipated 250–275 daily patients would last approximately five (5) to ten (10) minutes and occur between the early morning hours of 5:00 A.M. and 9:00 A.M. [*Id.* ¶ 12.] Mr. Martin also testified that most patients would simply be picking up their daily medication and going home, but a handful of patients—five (5) or six (6)—would be seen after medication is administered to them on site. [*Id.* ¶¶ 12, 33–34.] Mr. Martin also provided a more detailed breakdown when testifying to the Planning Board: about 50-75 percent of Plaintiffs' patients will be picking up their medication and leaving the facility; 25 percent will likely need a urine screen but will receive their medication and leave Plaintiffs' facility after that procedure; and a much smaller percentage of patients will be set up for on-site medication/counseling. [*Id.* ¶ 16.]

### D. Approval of Plaintiffs' Initial Zoning Permit Application

On or about March 20, 2018, Mid-America, the owner of the property Affinity sought to lease for its facility, submitted a zoning permit application in the name of Plaintiff Dr. Brown to the Township's Zoning Office. [Plaintiffs' SMF ¶ 28.] Ms. Powell still worked as a Zoning Officer at the time, and on March 28, 2018, Ms. Powell issued a zoning permit in the name of Plaintiff Dr. Brown, approving a "professional office providing behavior health services on an outpatient basis." [Plaintiffs' Brief, Ex. E.] On September 24, 2018, the Township's Construction Official issued a Certificate of Occupancy, permitting Plaintiff Dr. Brown to occupy

and operate the proposed facility. [*Id.*, Ex. Q.]

### E. Additional Licensing Requirements from the New Jersey Department of Health

On December 5, 2018, Affinity submitted its initial application to the New Jersey Department of Health ("NJDOH") for an Outpatient Substance Use Disorder Treatment Facility License. [Plaintiffs' SMF ¶ 34.] On September 9, 2019, NJDOH issued an evaluation report setting forth two additional licensing requirements for Plaintiffs' planned facility. [*Id.* ¶ 36.] First, Affinity was required to prove that it had informed the "governing authority of the municipality of the full scope of services, including opioid treatment to be provided at the facility." [*Id.* (emphasis added).] Second, NJDOH required Affinity to submit a Certificate of Occupancy (here the zoning permit) bearing the language "Opioid Treatment Program." [*Id.*]

Critically, Affinity's initially approved zoning permit did not include the "Opioid Treatment Program" label required by NJDOH, so Affinity reached out to Defendant Bradley—who had replaced Ms. Powell as the Zoning Officer assigned to Plaintiffs' application. [*Id.* ¶ 38.] However, Defendant Bradley determined that an amendment of Affinity's then-existing zoning permit would not be permitted, and that Plaintiffs would be required to resubmit a new zoning permit application. [*Id.*] Affinity simultaneously submitted a new zoning permit application to Defendant Bradley and a description of the full scope of its services to the Township Administrator. [*Id.* ¶ 39.]

F.     **Denial of Plaintiffs' Amended Zoning Permit Application**

Plaintiffs allege that beginning on or about November 12, 2019, Defendants put into motion a "plan . . . to hinder Plaintiffs in securing the necessary amended Zoning Permit through a maze of ever-changing requirements." [Plaintiffs' Brief at 4.] For example, Plaintiffs contend that it was Defendant Bradley's responsibility as the Zoning Officer to coordinate a fire inspection of the facility with the Voorhees Fire Department, but she failed to relay important information to the relevant parties concerning the relevant timing for that inspection. [Plaintiffs' SMF ¶¶ 41–44.] While the application was pending, Defendant Bradley also notified Plaintiffs of another requirement they still had not met: to produce a Certificate of Need issued by the State of New Jersey. [*Id.* ¶ 47.] However, when Plaintiffs contacted Jean DeVitto from the NJDOH, Ms. DeVitto advised them that opioid treatment programs are not covered by state regulations requiring a Certificate of Need.[3] [*Id.* ¶¶ 47–49.]

On or about December 11, 2019, Defendant Bradley emailed Plaintiffs that their amended zoning permit application constitutes a significantly different change of use than what was previously permitted on the property, and that Plaintiffs would be required to apply to the Planning Board for a proposed change of use consistent

---

[3] This Court is not convinced that these allegations amount to anything other than administrative qualms with Defendant Bradley's handling of Plaintiffs' zoning application, or at best, that she failed to dutifully perform her job. Municipal zoning officers should not be held to a standard of perfection, and it is to be expected that these kinds of issues, like a breakdown in communication or misinformation, may mistakenly occur during the complicated zoning application process. The Court is not persuaded that these allegations, on their own, suggest that Defendant Bradley was motivated by discriminatory animus against Plaintiffs' patients.

with Section 156.018 of the Township Code. [Plaintiffs' Brief, Ex. GG.] Defendants point out that a zoning permit for the property in question was issued in January 1994 to "Pro-Dent Professional Ctr" to build a "6,500 Sq. Ft. Frame, professional styled building." [Docket No. 86-3 (hereafter, "Defendants' Brief"), at 1.] Defendants claim that in their initial application, "Plaintiff[s] sought to convert the [property in question]'s office and warehouse space to 'professional office providing behavioral health service on an out-patient basis. No interior renovations proposed.'" [*Id.* at 2 (quoting Plaintiffs' Brief, Ex. E).] However, Defendants allege that this representation by Plaintiffs was not true, and that they only later learned after Plaintiffs' initiation application that the intended use of the property was not that of a medical office but more akin to a medical clinic. Plaintiffs filed an application seeking Planning Board review for a change of use on or about February 6, 2020. [Plaintiffs' Brief, Ex. HH.]

### G. The Planning Board Hearings Regarding Plaintiffs' Proposed Change of Use and Plaintiffs' Accusations of Discrimination

Plaintiffs' application for a change of use was reviewed by the Planning Board Engineer/Planner, Rakesh Darji ("Darji") of Environmental Resolutions, Inc. [Plaintiffs' SMF ¶ 64.] Mr. Darji authored a report advising the Planning Board that Affinity "should provide testimony indicating how the 'medical practice providing outpatient behavior health opioid treatment services' is consistent with the permitted uses" for the Township's O-1 zone. [Plaintiffs' Brief, Ex. M at 2.] Prior to any Planning Board hearing, there were five (5) email exchanges—totaling 13 separate

emails—between the parties where Planning Board members were copied as recipients. [*Id.*, Ex. H.] Residents of Voorhees also wrote emails to the Township expressing their concerns about the proposed facility in the time leading up to the Planning Board hearings, which Plaintiffs allege "exhibited prejudice against disabled persons, dealt in stereotypes, raised unfounded fears, and speculated as to decreased property values." [*Id.*, Ex. J; *see also* Plaintiffs' SMF ¶¶ 70–71.]

Plaintiffs appeared monthly via video conference at four (4) Planning Board hearings on July 22, August 26, September 23, and October 14, 2020, during the COVID-19 pandemic. [Plaintiffs' SMF ¶ 68.] Plaintiffs allege that Planning Board members and the Board's Solicitor, "freely and without inhibition. . . embarked on a course of discriminatory conduct," that "ran the gamut" during these hearings:

> [F]rom restricting Plaintiffs from offering relevant testimony and evidence, offering on the record patently discriminatory statements; through distain and disinterest during the hearings, to improper consideration of speculation, fostering false and factually ungrounded stereotypes, and engaging in off the record undisclosed discussions related to Plaintiffs' application.

[Plaintiffs' Brief at 5.]

Plaintiffs accuse the Planning Board of turning a blind eye to their positions and supporting arguments offered during the hearings. More specifically, Plaintiffs claim to have observed members of the Planning Board eating, sleeping, watching TV, talking, driving, and/or stepping away from or even powering down their computers during the Planning Board hearings. [Plaintiffs' SMF ¶ 72.] Defendants admit some of this behavior occurred intermittently, but deny such behavior was pervasive during the hearings. [Docket No. 86-1 ¶ 72.] According to Defendants,

from the first Planning Board hearing, Plaintiffs' counsel "intended to poison the well with injecting issues of discrimination into the change of use application." [Defendants' SMF ¶ 11.]

Plaintiffs further criticize several individual Planning Board members for offering alleged inappropriate and discriminatory questions and comments during the hearings: Board Member Mario DiNatale asked if Plaintiffs' patients receive methadone via intravenous needles; Board Members Anthony Nicini and Jason Ravitz asked about security needs for the proposed facility in light of the "drugs dispensed"; Mr. Nicini stated that it was more likely that addicted persons (versus those who do not suffer from addiction) would cause trouble with neighborhood children; Mr. Nicini suggested Plaintiffs' patients may include pedophiles; and Mr. Ravitz testified that it is "well documented" that drug dealers are drawn to facilities like the one proposed to "prey" on potential patients suffering from opioid use disorder, among others. [Plaintiffs' SMF ¶¶ 74–80 (citations omitted).]

The Planning Board also permitted eight (8) members of the public to comment on the record during the September 23rd and October 14th hearings, whose testimony raised a consistent "not-in-my-backyard" styled opposition, described by Plaintiffs as "speculative, biased, and factually unsupported." [*Id.* ¶ 81.] Plaintiffs highlight parts of the public commentary record that express a wide range of concerns with Plaintiffs' proposed facility, including increased traffic flow, proximity to a school, decreased property values, attracting drug dealers, and patient side effects like driving while dizzy after taking medication, among others. [*Id.* (citations

omitted).]

Plaintiffs sought to have two (2) doctors, Dr. Hobelmann and Dr. Edwards, testify at one of the hearings about the serious nature of the opioid crisis. [Plaintiffs' SMF ¶ 82.] However, Plaintiffs contend that the testimony of both doctors was met by the Planning Board essentially dismissing their input as irrelevant. [Plaintiffs' SMF ¶¶ 81–87.]

On the other hand, Defendants criticize Plaintiffs for dismissing the Planning Board's legitimate land use concerns—regarding whether the facility was a "medical office" versus a "medical clinic"—as irrelevant "since both definitions fit under the umbrella of 'medical practice.'" [Defendants' SMF ¶¶ 15–16 (citations omitted).] Defendants argue that the Township Code and New Jersey statutes distinguish between medical "offices" and "clinics" and in this case the distinction was one that mattered:

> If the proposed used is an office, then the Board has jurisdiction to both approve the change of use under [Township Code] § 156.018(A), and to consider the site plan waiver requestion under § 156.018(D). If it is a clinic, the use is not permitted, and the applicant would need to seek a use variance from the Zoning Board, under N.J.S.A. 40:55D-70(d)(1).

[Defendants' Brief at 5.] Defendants' argument goes as follows: "simply because the Board concluded that you chose the wrong forum, does not convert that ill-conceived course of action into a viable cause of action." [*Id.* at 6 (emphasis in original).]

The Board's Planner/Engineer, Mr. Darji, testified that higher traffic volumes and unusual operating hours are reasons why the O-1 zone did not permit Plaintiffs' proposed use. [Defendants' SMF ¶ 22.] Plaintiffs' traffic consultant, David

Shropshire, also testified regarding the calculation of potential traffic counts using the Pinnacle Treatment Center in Pennsauken, New Jersey as a best estimate for Plaintiffs' facility. [*Id.* ¶ 18.] Defendants, however, suggest that the widely accepted Institute of Transportation Engineers' ("ITE") trip generation under "medical office" would have provided a more representative traffic count consistent with the requirements of a facility permitted in the O-1 zone instead of facility that operated nearby as a medical clinic. [*Id.*] Interestingly, Mr. Shropshire also chose not to use RCA's facility to provide a traffic count estimate, which Defendants suggest further proves that RCA's facility and Plaintiffs' proposed facility do, in fact, have different operating models that impact legitimate land use considerations for each facility like parking and expected patient load.

Plaintiffs allege that the Planning Board recognized and acknowledged its authority to impose a limitation on the number of patients that could be treated as a "reasonable accommodation." [Plaintiffs' Brief ¶ 94.] Plaintiffs further contend that during the Planning Board deliberations, the Board considered other zones where Plaintiffs' proposed facility could operate as a permitted use, including the Town Center, which also includes schools and daycare centers. [Plaintiffs' SMF ¶¶ 101–02.] Finally, Plaintiffs allege that a more "egregious example" of Defendants' conduct was the "extortion of Plaintiffs hours before the last Planning Board hearings," when Planning Board Secretary, Wendy Flite, emailed Plaintiffs and demanded they pay $8,8013.82 to the Township's escrow account for their application to be heard.

[Plaintiffs' Brief at 6 (citing Exs. QQ, RR, and SS).][4]

## H.    The Planning Board's Decision

At the October 14th hearing, Planning Board Member DiNatale moved to deny Plaintiffs' application, Planning Board Member Nicini seconded the motion, and the motion passed unanimously in a 9–0 vote. [Defendants SMF ¶¶ 24–25.] Each Planning Board member commented briefly on the record, expressing land use concerns as to why Plaintiffs' facility did not qualify for a permit for the O-1 zone. [*Id.* ¶ 26.] The Planning Board adopted its final written Resolution on February 10, 2021, setting forth the below official reasons for the denial of Plaintiffs' application

---

[4] Plaintiffs allege this conduct violated the following state law:

> If an escrow account or deposit contains insufficient funds. . . the chief financial officer of the municipality shall provide the applicant with a notice of the insufficient escrow or deposit balance. In order for work to continue on the development or the application, the applicant shall within a reasonable time period post a deposit to the account in an amount to be agreed upon by the municipality or approving authority and the applicant. In the interim, any required health and safety inspections shall be made and charged back against the replenishment of funds.

N.J.S.A. § 40:55D-53.2c. Defendants do not dispute that Ms. Flite's email was not sent at the direction of the Voorhees chief financial officer, but rather was drafted after she consulted with the Township's outside counsel from Platt Law Group. [Plaintiffs' SMF ¶ 110.] Again, the Court is not convinced that this amounts to anything other than administrative oversight by a municipal official, specifically, by passing along misinformation she had received from the Township's outside counsel. Defendants also explain why such oversight occurred, as Ms. Flite's mother had recently passed away and upon returning to work, she was concerned that she had committed an error with Affinity's escrow account and sought guidance from counsel. [Plaintiffs' Brief, Exhibit SS at 2–3.] Upon receiving this advice, she sent the email to Plaintiffs. [*Id.*] Plaintiffs' do not contest that an improper amount was ever withheld from them from the Township. Thus, the Court is not persuaded that Ms. Flite's email, passing along the misinformation she had received, was indicative of intentional discrimination by her as portrayed by Plaintiffs.

for a change of use:

The Planning Board finds and concludes that the proposed change in use application must be denied because the nature of this proposed methadone treatment facility is the equivalent of a "medical clinic", which use is not permitted in the "transitional and less intensive" 0-1 Zoning District, but rather in only the more commercial MB and TC Zoning Districts. The Board finds that the Township Committee intended to restrict such use to these zoning districts along state highways and major arteries. The properties in these zones have a better road network to accommodate the traffic loads and larger office buildings with more parking to accommodate the proposed parking loads from this more commercially intense use.

The Planning Board further finds that the list of permitted "office" uses in the 0-1 Zone are those in which customers/patients are seen throughout the business day and by appointment only, limiting the intensity of the use. Such permitted uses include offices of a recognized profession including but not limited to medicine, social services, finance, accounting, insurance, real estate, law, engineering, architecture and planning. Explicitly excluded from this list of permitted licensed uses is licensed barber shops, which often have walk-in clientele without appointments.

The Planning Board finds that the Shropshire Traffic and Parking Study from Pennsauken, and Mr. Shropshire's own testimony, illustrate the point that the proposed use is not a "medical office use". Mr. Shropshire indicated that parking and traffic data for a medical office use from the ITE manual cannot be used because the proposed use is different than a medical office. The lack of scheduling patient visits evenly and throughout the day makes this land use a different use classification from a medical office use.

The Planning Board finds that it relies upon the unrebutted expert planning testimony by Mr. Darji in support of its conclusions above. The Board further notes that Applicant proffered no expert planning testimony to the contrary to support its view the Applicant's facility is a "medical office" use in the 0-1 Zone.

The Planning Board further finds that the subject property lacks sufficient parking to accommodate between 275-600 patients daily, when Applicant is a tenant occupying only two of six office suites in the office building, which building must provide sufficient parking to meet the needs of all its tenants. Applicant has not credibly demonstrated that there is sufficient parking for its full daily parking loads for patients and its staff (physicians, nurses, physician assistants, counselors and clerical employees). In fact, the Board cannot even

17

determine the full parking need for this proposed facility, based on the record presented, and whether such authorized parking (only 20 spaces allocated to the Applicant in the 2018 Zoning Permit) and 64 total spaces within the parking lot would be sufficient to meet the full needs of the Applicant, and the five other tenants in the office building. The Planning Board finds that any site plan application that might later be filed by Applicant will most certainly require bulk variance relief from Township parking ordinance requirements.

The Planning Board further finds and concludes that the waiver of site plan approval cannot be granted because the proposed use does not meet the requirements of the Voorhees Township Zoning Ordinance, the Township's site plan ordinance standards and even the requirements of the 1984 site plan approval for the subject property for the reasons set forth above.

Finally, the Planning Board finds and concludes that since the Applicant's proposed use for a medical clinic is not a permitted use in the 0-1 Office Zone, it lacks jurisdiction to grant any relief to the Applicant. Applicant must apply to the Voorhees Zoning Board of Adjustment to seek use variance approval, pursuant to the statutory requirements of N.J.S.A. 40:55D-70d.

[Plaintiffs' Brief, Ex. JJ ¶¶ 57–63.]

The parties agree there is no definition within the Township Code for the term "medical clinic." [Plaintiffs' SMF ¶ 106.] The parties also agree that Plaintiffs never applied to the Voorhees Zoning Board of Adjustment for any "use variance approval" as set forth in N.J.S.A. § 40:55D-70.

## II.    PROCEDURAL BACKGROUND

In a complaint filed with this Court on January 15, 2021, Plaintiffs asserted a scattershot attack against Defendants, alleging the following causes of action: Violation of Title II of the Americans with Disabilities Act (the "ADA") Disparate Treatment (Count One), Disparate Impact (Count Two), and Failure to Make Reasonable Accommodation (Count Three); Violation of the Rehabilitation Act ("RA") (Count Four); Violation of Section 1983 (Count Five); Substantive Due

18

Process Violations under the Fifth and Fourteenth Amendments and Section 1983 (Count Six); Equal Protection Violations under the Fourteenth Amendment and Section 1983 (Count Seven); Violations of New Jersey Law—that governing municipalities' zoning and planning boards and officials (Counts Eight, Nine, and Ten); and Violation of New Jersey's Law Against Discrimination ("NJLAD") (Count Eleven). [Docket No. 1 ¶¶ 237–320 (hereafter, the "Complaint").]

On March 12, 2021, Plaintiffs filed an Emergency Motion for Preliminary Injunction with Temporary Restraints. [Docket No. 6.] On March 30, 2021, the Court administratively terminated the motion after holding a status conference with the parties and ordered the litigation to proceed with expedited discovery. [Docket No. 18.] On August 6, 2021, in response to a letter from Plaintiffs' counsel concerning their application for temporary restraints, the Court clarified that:

> To the extent that Plaintiffs are requesting a temporary restraining order, that relief is DENIED. Any form of temporary restraints at this time would upend the status quo, and Plaintiffs have failed to make the requisite showing of irreparable harm to warrant such relief. To the extent Plaintiffs are requesting a preliminary injunction, the Court will convert Plaintiffs' request to one for a permanent injunction and consolidate the hearing with a trial on the merits. *See* Fed. R. Civ. P. 65(a)(2).

[Docket No. 39.]

The parties proceeded with discovery, and on November 12, 2021, Defendant Planning Board moved for partial summary judgment as to Counts Eight, Nine, and Ten and Defendant Zoning Board moved for summary judgment to dismiss all claims against it. [Docket No. 67.] On December 31, 2021, Plaintiffs moved for summary judgment as to all counts. [Docket No. 74.] Defendants cross moved for

summary judgment as to all counts on February 28, 2022. [Docket No. 86.]

On April 12, 2022, the Court entered an Order administratively terminating the earlier partial summary judgment motions by the Planning Board and Zoning Board defendants, acknowledging the superseding summary judgment motions as to all counts by all parties, and stating that it "will consider all briefing submitted by the parties. . . in adjudicating the pending cross motions for summary judgment." [Docket No. 96.] Those motions are now presently before the Court and are ripe for adjudication.

## III. JURISDICTION

This Court has original subject matter jurisdiction over the present action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises, in relevant part, under the laws of the United States.  This Court is also satisfied that venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because Defendants are residents of this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV. LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might impact the "outcome of the suit under the governing law." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. *Id.*

20

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." *Connection Training Servs. v. City of Philadelphia*, 358 F. App'x 315, 318 (3d Cir. 2009). "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." *Id.*

In the face of a properly supported motion for summary judgment, the non-movant's burden is rigorous. They "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (noting that "speculation and conjecture may not defeat summary judgment") (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)).

## V.   ANALYSIS

At the outset, the Court notes that Plaintiffs have proffered that "there is outstanding discovery." [Plaintiffs' Brief at 1.] Nevertheless, the Court now considers what disputed material facts remain in light of Plaintiffs' claims and whether these disputed facts matter to the Court's resolution of the pending cross motions for summary judgment.

### A.   Plaintiffs' Claims of Disability Discrimination

The Americans with Disabilities Act ("ADA") and the Rehabilitation Act

("RA") prohibit discrimination on the basis of disability. Title II of the ADA

provides that "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any

such entity." 42 U.S.C. § 12132. Similarly, the Rehabilitation Act contains the

following provision: "[n]o otherwise qualified individual with a disability in the

United States. . . shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity receiving Federal financial assistance. . . " 29 U.S.C. §

794(a). The Third Circuit analyzes these statutory provisions together, "[a]s the

ADA simply expands the Rehabilitation Act's prohibitions against discrimination

into the private sector, [and] Congress has directed that the two acts' judicial and

agency standards be harmonized." *New Directions Treatment Servs. v. City of Reading*,

490 F.3d 293, 302 (3d Cir. 2007) (citing *Newman v. GHS Osteopathic, Inc., Parkview

Hosp. Div.*, 60 F.3d 153, 157–58 (3d Cir. 1995); *Innovative Health Sys., Inc. v. City of

White Plains*, 117 F.3d 37, 44 (2d Cir.1997)). It is also well-established that the ADA

and RA apply to municipal zoning decisions. *New Directions*, 490 F.3d at 305 (finding

that a facially discriminatory law "that singles out methadone clinics for different

zoning procedures is facially discriminatory under the ADA and the Rehabilitation

Act").

The Third Circuit further clarified in *New Directions* that so long as they are not

"currently engaging in the illegal use of drugs," recovering "addicts are

22

presumptively 'qualified' persons under the ADA and Rehabilitation Act." *Id.* at 308–09 (citations omitted). Here, there is no dispute that Plaintiffs' prospective patients who are recovering from opioid use disorder are qualified persons within the meaning of the ADA and RA, as well as under the more expansive NJLAD. [Plaintiffs' SMF § 3.] Further, Defendants have not challenged Plaintiffs' standing to bring the present action on behalf of their prospective patients, consistent with decisions by federal courts finding that treatment facilities like Plaintiffs' have standing to bring disability discrimination claims on behalf of their clientele. *See Innovative Health*, 293 F.3d at 47 (explaining that the broad statutory language in the relevant enforcement provisions of Title II of the ADA and the RA, extending relief to "*any person* alleging discrimination on the basis of disability" and "any person aggrieved" by such discriminatory conduct, respectively, "evinces a congressional intention to define standing to bring a private action. . . as broadly as is permitted by Article III of the Constitution") (citations omitted) (emphasis in original); *see also MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335 (6th Cir. 2002) (explaining that "[b]ecause [p]laintiff has presented evidence that it was denied a zoning permit because it cares for and/or associates with individuals who have disabilities, [p]laintiff has standing to bring this suit on its own behalf").

Claims of discrimination on the basis of disability status under the ADA, RA, and/or NJLAD may proceed under any or all of the following three theories of liability: (1) disparate treatment or intentional discrimination; (2) disparate impact; and (3) failure to make reasonable accommodation. *See Yates Real Est., Inc. v.*

*Plainfield Zoning Bd. of Adjustment*, 404 F. Supp. 3d 889, 915 (D.N.J. July 31, 2019).

Here, Plaintiffs raise all three theories potential bases for Defendants' liability. The

Court now considers each theory in turn.

### 1.    Disparate Treatment

"[T]o prevail on a disparate treatment claim, a plaintiff must demonstrate that

some discriminatory purpose was a 'motivating factor' behind the challenged

action." *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005)

(citations omitted). To constitute a motivating factor, the alleged discriminatory

purpose "need not be malicious or invidious, nor need it figure in solely, primarily,

or even predominantly into the motivation behind the challenged action." *Id.*

(quotations and citations omitted).

### a.    Plaintiffs' *Prima Facie* Case of Disability Discrimination

It is Plaintiffs' burden to prove that that a protected characteristic, here their

patients' status as persons with disabilities, "played a role" in motivating Defendants'

decision to deny Plaintiffs' zoning application. In their supporting brief, Plaintiffs

claim that Defendants engaged in intentional discrimination on the basis of disability

in two main respects. First, by "[i]mposing discriminatory procedures, including

requiring a change of use review application and a public hearing" when such

procedures were not required of other property owners and tenants operating within

the Township's O-1 zoning district or of other operators of outpatient healthcare

facilities "serving both disabled and non-disabled persons." [Plaintiffs' Brief at 14.]

Second, Plaintiffs allege that "the hearing record establishes that the Board members,

the Board's professionals, and the general public, manifested discriminatory animus against persons in recovery sufficient to demonstrate evidence of intentional discrimination against Plaintiffs." [*Id.*]

Plaintiffs are correct that municipalities run afoul of the ADA and RA when they impose additional procedural requirements upon only those zoning permit applicants providing services to individuals with disabilities. *See Smith Berch, Inc. v. Baltimore Cnty., Maryland*, 115 F. Supp. 2d 520, 523 (D. Md. 2000), *order clarified sub nom. Smith-Berch Inc. v. Baltimore Cnty., Maryland*, 216 F. Supp. 2d 537 (D. Md. 2002), *vacated on other grounds*, 64 F. App'x 887 (4th Cir. 2003) (finding a local zoning ordinance unlawful that required only drug treatment programs offering methadone therapy to undergo a public hearing to receive a zoning permit). Here, Plaintiffs allege that Defendants initially approved a zoning permit for their facility in 2018 in Plaintiff Dr. Brown's name, but once they learned that the facility would dispense methadone, Defendants reclassified Plaintiffs' proposed facility as a "medical clinic" instead of a permitted "medical office" within the O-1 Zone and "denied it a permit to operate." [Docket No. 94 ("Plaintiffs' Reply Brief"), at 30.] The parties also agree that RCA was never required to go through these additional procedural steps after its initial zoning application was approved.

Plaintiffs are also correct that local zoning and planning boards violate federal anti-discrimination laws when zoning decisions are based on speculative fears concerning formerly addicted persons. *Innovative Health*, 117 F.3d at 49 (explaining that while a municipality "certainly may consider legitimate safety concerns in its

zoning decisions, it may not base its decisions on the perceived harm from such stereotypes and generalized fears"). Plaintiffs allege that Defendants' discriminatory bias against recovering opioid addicted persons is evidenced by the sentiments occasionally conveyed during the Planning Board hearings, including the questions and comments offered by Planning Board Members themselves, the public commentary the Planning Board allowed to be put on the record, and the alleged distracted/disrespectful behavior exhibited by Planning Board members who failed to give Plaintiffs their undivided attention at all times during the four (4) hearings that lasted roughly 12 hours in total. [Plaintiffs' Brief at 14–15.] As discussed, the alleged discriminatory testimony at the Planning Board hearings came in many forms, including comments expressing fears for neighborhood children given the proximity of Plaintiffs' facility to local schools, the potential for the facility to attract pedophiles, drug dealers, and drug users into the area, lower property values, and the potential for an increase in crime, among other common themes. *Supra.* at 12.

The Court understands Plaintiffs' claims but finds it imperative to distinguish the present action from many of the cases Plaintiffs cite. Unlike in *Innovative Health* or *Smith Berch*, Plaintiffs here are not contesting the validity of any state or local law that facially discriminates against, or singles out for less favorable treatment, facilities that provide methadone to patients recovering from addiction. The Court is satisfied that the Voorhees Township Code does not single out drug treatment programs like Plaintiffs' in such a way, and as written, the Court finds the Township Code is facially neutral in this respect. Instead, Plaintiffs' behind-the-scenes allegations are

26

that "Defendants' actions were intentionally discriminatory because they were made in the context of strong, unfounded discriminatory opposition from the Defendants themselves and local residents." [Plaintiffs' Reply Brief at 31.] Nevertheless, for purposes of this motion, the Court will assume that Plaintiffs have met their initial burden to establish a *prima facie* case of intentional discrimination.

> **b.** **Defendants' Nondiscriminatory, Legitimate Land Use Justifications for Denying Plaintiffs' Zoning Applications**

Once Plaintiffs have established a *prima facie* case of disparate treatment, the burden shifts to Defendants "to articulate some legitimate, nondiscriminatory reason for" the adverse action taken. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993). Here, the Court is persuaded that Defendants have persuasively articulated nondiscriminatory reasons for the denial of Plaintiffs' application, namely that Plaintiffs' proposed use for its leased facility within the Township's O-1 zone did not qualify under any of the permitted uses for that zone.

The Court is satisfied that none of the reasons articulated by the Planning Board—either in its final written Resolution or the reasons provided on the record by Planning Board members when voting to deny Plaintiffs' change of use application— concern the protected disability status of Plaintiffs' patients. Indeed, the Planning Board cited many nondiscriminatory land use justifications in its Resolution to explain why Plaintiffs' proposed facility did not qualify as an approved "medical office," which would require a lower number of daily patients than Plaintiffs'

estimated 250-275 daily patients and that patients be treated during the course of regular business hours, among other things, to qualify as a permitted use in the transitory O-1 zone. [Plaintiffs' Brief, Ex. JJ ¶¶ 57–61.]

Although the Township Code does not include definitions for the terms "medical office" or "medical clinic," the permitted uses for other zoning districts in Voorhees, unlike the O-1 zone, expressly include "medical clinics." *See* Township Code § 152.137(A)(3)(a)(8) (permitting "[m]edical and dental clinics, nursing homes and hospitals" in the Township's "Center" zoning district); *see also* Township Code § 152.013 (specifying that the permitted principal uses for the Township's "Major Business" zoning district include "[a]ll types of medical and health care related uses, such as hospitals, ambulatory surgical center, medical clinics, medical offices and the like. . . "). The Township is certainly not an outlier in this respect, and as further support for their argument, Defendants have provided an exhibit listing 42 statutes where the State of New Jersey has made a distinction between "medical offices" and "medical clinics." [Defendants' Brief, Ex. F.]

The Court finds that the Township legislated an important distinction for land use purposes between those medical facilities that operate as an "office" versus as a "clinic" by including only "medical office" as a permitted use in the O-1 zone and omitting "medical clinic," but expressly allowing "medical clinic" as a permitted use in other zoning districts. *See Keeley v. Loomis Fargo & Co.*, 183 F.3d 257, 265–66 (3d Cir. 1999) (explaining that "[u]nder the well-established principle of statutory construction, *expressio unius est exclusio alterius*. . . [the] explicit expression of one

28

thing. . . indicates its intention to exclude other exceptions"). The Court also finds persuasive Defendants' argument that the Township intended the distinction between "medical office" and "medical clinic" for obvious land use reasons. The Township expressly permits medical clinics—more akin to a hospital or other larger/more commercial medical facility—in at least two (2) other zoning districts in Voorhees. However, medical clinics are not permitted in the transitional and less intensive O-1 zone where Plaintiffs' leased facility was located—even though a medical office with a less intensive and less commercial use is permitted. As the numerous references to state statutes making this same distinction further illustrate for purposes of state law and local zoning considerations, the distinction between a medical clinic and a medical office is not only a common zoning concept, but also anchored in common sense.

The Court is also convinced by Defendants' argument that the record is devoid of any evidence as to how Plaintiffs' land use justification to the Planning Board as to how its proposed facility qualifies as a permitted use as a "medical office." In fact, the evidence Plaintiffs procured only seems to confirm the opposite. For example, the Planning Board wrote in its Resolution that a reason for denying Plaintiffs application was the testimony of Plaintiffs' own traffic consultant "that parking and traffic data for a medical office use from the ITE manual cannot be used because the proposed use is different than a medical office." [Plaintiffs' Brief, Ex. JJ ¶ 59.] Plaintiffs' primary witness, Mr. Martin, also likened Plaintiffs' facility to a pharmacy in his testimony before the Planning Board, but the Court agrees that there

is also an obvious land use distinction between a pharmacy and a "medical office." Finally, Defendants cite a portion of New Jersey's Municipal Land Use Law, which makes clear that a facility providing outpatient methadone medication like Plaintiffs' does not qualify as a medical office:

> For the purposes of any zoning ordinance adopted by any municipality in the State. . . a municipality may provide within the ordinance that a facility offering outpatient methadone maintenance services, hereinafter referred to as a "methadone clinic," shall be deemed to be a 'business' or commercial operation or functional equivalent thereof and shall not be construed, for zoning purposes, as ancillary or adjunct to a doctor's professional office. When a municipality has adopted such an ordinance, the siting of a methadone clinic within a municipality shall be limited to zones designated for business or commercial use.

N.J.S.A. 40:55D-66.10 (entitled "Methadone Clinic Deemed Business for Zoning Purpose").

The Court finds that the distinction between a "medical clinic" and a "medical office" is one with an important difference in land use terms, and one that Voorhees intentionally incorporated into its Township Code. The Planning Board had to discern which of these categories Plaintiffs' proposed facility fell within because only "medical offices" with less intensive uses are permitted within the transitional O-1 zone. The distinction Plaintiffs attempt to ignore is especially consequential. If Plaintiffs' intended use was, in fact, not one of a "medical office," then the Planning Board was correct that it did not even have jurisdiction to approve Plaintiffs' application for a change of use. Instead, Plaintiffs would be required to apply to the Zoning Board of Adjustment for a use variance. That is also the ultimate determination that the Planning Board reached with Plaintiffs' zoning permit

application.

For these reasons, the Court is satisfied that Defendants have met their burden to provide a nondiscriminatory reason for the adverse action taken, and that such reason is consistent with the evidence of record they cite.

### c. Plaintiffs Have Failed to Provide Evidence that Defendants' Nondiscriminatory Land Use Justifications for Denying Their Zoning Applications Were Pretextual

If Defendants can articulate a legitimate, nondiscriminatory reason for the adverse action taken, the burden shifts back to Plaintiffs to prove that Defendants' stated reasons were merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 798. The Court has already found that the reasons provided by the Planning Board for its denial of Plaintiffs' application—including those provided in the Planning Board's final written Resolution and the reasons provided on the record by Planning Board members when voting to deny Plaintiffs' change of use application—are limited to land use justifications alone and express no discriminatory rationale or basis. *Supra.* at 26. Again, the evidence relied upon by Plaintiffs in support of their disparate treatment claim essentially falls into two categories. [Plaintiffs' Brief at 14.] First, are the alleged procedural obstacles Plaintiffs faced during the application process, more specifically, that they had to apply to the Planning Board for a change of use and submit a traffic study in support of their application, even though these steps were not required when they initially applied nor were they required of RCA when applying for its zoning permit. [*Id.*] Second, are the alleged biases conveyed during the Planning Board hearings by the Planning Board members and members of

31

the public, which Plaintiffs suggest are indicative of intentional discrimination. [*Id.*]

The Court finds that, procedurally, Plaintiffs should not be permitted to rely upon, as evidence of intentional discrimination, zoning application requirements imposed by Defendants that ultimately confirmed that Plaintiffs' intended use of the facility did not qualify as a permitted use for the 0-1 zone. For example, it is not in dispute that Plaintiffs' own traffic consultant, David Shropshire, decided not to use a widely accepted traffic count for a "medical office," but rather a traffic count for a larger nearby medical facility as representative of the traffic count to be expected at Plaintiffs' proposed facility. It also seems obvious how such evidence would be pertinent to the Planning Board's decision. Plaintiffs should not be allowed to challenge the traffic study requirement as discriminatory just because they could not satisfy it per their own traffic consultant. Further, the parties do not dispute that Plaintiffs' intended use of the facility was different than what was previously permitted on the property, which only seems to suggest that a change of use application was always warranted for Plaintiffs' proposed facility. Regardless, the Planning Board ultimately determined that even more was required in this instance; as a use variance from the Zoning Board of Adjustment was the only applicable zoning exception that would allow Plaintiffs to operate their facility as intended.

The fact that Defendants failed to make this determination regarding Plaintiffs' own application earlier does not necessarily suggest that Defendants were motivated by discriminatory bias. Nor does the fact that the Township did not require these specific submissions from RCA, which the parties do not dispute

operates a very different kind of facility in terms of land use. Why would the

Planning Board need additional evidence unless and until it identified a land use

concern, and just because the Planning Board identified a legitimate zoning concern

with Plaintiffs' application based on its proposed facility, how does it follow that the

same land use concerns were ever applicable to RCA's facility? To put it differently,

the Court finds that Plaintiffs should not be permitted to rely upon RCA's

application as comparator evidence of intentional discrimination when they have

failed to establish that their facilities are comparable in land use terms. The Court is

persuaded by Defendants' argument that such a comparison is more like apples-to-

oranges, and Plaintiffs have failed to provide evidence showing that a comparison of

their facility to RCA's is like apples-to-apples in support of their disparate treatment

claim. To put it simply, the procedural hurdles Plaintiffs faced were warranted in

light of their application, and thus, are not evidence of a pretext for discrimination.

Next, the Court will consider Plaintiffs' allegations that the Planning Board's

decision was motivated by bias conveyed during the hearings. The Court has

reviewed the recordings of each of the four (4) hearings before the Planning Board in

2022 on the following dates: July 22 (lasting approximately one and one-half (1½)

hours), August 26 (lasting approximately three (3) hours), September 23 (lasting

approximately four (4) hours), and October 14, 2020 (lasting approximately three

and one-half (3½) hours). [Plaintiffs' Reply Brief, Ex. AAA.] The Court disagrees

with Plaintiffs' characterization of those hearings. Based on its review of the

Planning Board hearings, the Court is persuaded that Plaintiffs' have overstated their

33

allegations that Planning Board Members were distracted, preoccupied, and disregarded and/or ignored Plaintiffs' arguments and the testimony of their medical experts. To the contrary, the Court finds that Planning Board members were quite engaged.

With respect to the alleged biased testimony offered by individual Planning Board members, the Court finds that Plaintiffs have fundamentally taken the statements made out of context. The applicable missing context appears to be, in large part, the Planning Board members' attempts to ask about legitimate land use concerns. For example, Plaintiffs criticize Board Member DiNatale for asking whether Plaintiffs' patients receive treatment via intravenous needles [Plaintiffs' SMF ¶ 74], but based on the Court's review of the transcript, it is apparent that Board Member DiNatale was attempting to generally understand how the treatment worked, including asking whether patients have to check in, which is more indicative of how long the process takes and the amount of time patients spend on the premises.[Docket No. 6, Ex. 3T:26:1–11.] Although the question could have been asked more artfully, the underlying concern does not appear to be rooted in bias against Plaintiffs' patients because of their disability status based on this Court's review of the transcript.

Similarly, the Court finds that the challenged testimony regarding issues with neighborhood children and the potential to draw criminals into the community were largely taken out of context as portrayed by Plaintiffs. [Plaintiffs' SMF ¶¶ 76–78.] Plaintiffs' attorney was the one who explicitly asked Planning Board members to

identify any issues they had with respect to children [Docket No. 6, Ex. 3T:77:24–25], and the response given focused primarily on pedestrian use of sidewalks, including by children at nearby schools even noting that the proposed opioid treatment program was "a great thing" overall. [*Id.*, Ex. 3T:78:2–25.] Plaintiffs also allege that Board Members Anthony Nicini and Jason Ravitz asked about security needs for the proposed facility in light of the "drugs dispensed," but the Court finds that line of questioning, read in context, was primarily focused on the intensity of the facility's use. [*Id.*, Ex. 3T:52:15–18, 24–25; 53:1–5.]

As to the commentary offered by members of the public during the Planning Board hearings, it bears noting that, absent additional evidence that Defendants failed to procure during discovery, Plaintiffs allege as discriminatory speech that was protected under the First Amendment. *See Zapach v. Dismuke*, 134 F. Supp. 2d 682, 688 (E.D. Pa. 2001) (explaining that "there can be little doubt that" commentary offered during a public zoning hearing "is protected under the First Amendment"). Plaintiffs have offered no evidence that the public commentary was introduced by Defendants to inject bias into the record. In fact, the Court finds that the commentary offered was representative of the concerns expressed by the public via email before the Planning Board hearings. [Plaintiffs' Brief, Ex. J.] Although Defendants certainly cannot pollute the record with unfairly biased or prejudicial testimony, the public has a right to be heard during a public proceeding. Defendants can only be expected to take reasonable precautions to prevent or correct public commentary that may be viewed as inappropriate, offensive, or biased if it is

introduced on the record. In that same vein, public officials also have a right, indeed a duty, to ask questions regarding the public's concerns.

The Court finds that the public commentary Plaintiffs challenge as indicative of bias against persons with disabilities is not enough. Plaintiffs have failed to connect the dots and explain how such comments motivated the Planning Board's decision, which was limited to land use justifications for denying Plaintiffs' zoning application. Plaintiffs make an argument that the Planning Board solicitor should have instructed the board members not to be influenced by any testimony that expressed bias towards persons with disabilities. The Court agrees. But again, the Court is not being called on to decide how dutifully each of the public officials involved with Plaintiffs' applications performed their roles. And in any event, Plaintiffs' counsel provided several reminders during the Planning Board hearings that unlawful bias should not impact the Planning Board members in making their decision. Without any evidence that Defendants improperly influenced the public commentary being offered or any evidence that the inappropriate comments had any bearing on the Planning Board's decision, the Court finds that Plaintiffs' allegations concerning the alleged discriminatory public comments fail to advance their disparate treatment claim.

The ADA and RA prohibit the Planning Board from basing its decision on speculative fears concerning formerly addicted persons. At best, Plaintiffs point to a few stray comments made during the four (4) Planning Board hearings that spanned roughly 12 hours during which hundreds of questions were asked and much lengthy

testimony was provided. There were inappropriate comments about drug dealers potentially preying on patients, and Plaintiffs are correct that inappropriate commentary should not have been offered. However, the relevant inquiry before this Court is not whether the Planning Board conducted a 12-hour hearing where the record was completely devoid of human biases. That would be an impressive feat for a public hearing before a municipal zoning board. Instead, the relevant inquiry is whether there is sufficient evidence to support Plaintiffs' disparate treatment theory that Defendants' denial of Plaintiffs' zoning application was motivated by intentional discrimination. More than a few stray remarks cherry-picked out of a transcript of as impressive of volume as this is required to survive Defendants' motion for summary judgment.

The Court finds that Plaintiffs fail their burden to cite evidence of record to show that the non-discriminatory, legitimate land use reasons given by Defendants for denying Plaintiffs' zoning application were a pretext for disparate treatment discrimination on the basis of disability. Accordingly, the Court will grant Defendants' summary judgment motion with respect to Count One of the Complaint.

### 2.    Disparate Impact

To prove a disparate impact theory of disability discrimination, Plaintiffs must demonstrate that the facially neutral zoning requirements set forth in the Voorhees Township Code had "a significantly adverse or disproportionate impact" on persons in a protected category, here Plaintiffs' patients. *Lapid-Laurel, L.L.C. v. Zoning Bd. of*

*Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 466 (3d Cir. 2002). "Typically, 'a disparate impact is demonstrated by statistics,' and a *prima facie* case may be established where 'gross statistical disparities can be shown.'" *Hansen Found., Inc. v. City of Atl. City*, 504 F. Supp. 3d 327, 338 (D.N.J. 2020) (quoting *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977)).

In *Lapid-Laurel*, the Third Circuit rejected an argument that a town's zoning ordinance was discriminatory—under a theory of disparate impact liability—when the main argument offered in support of such theory was that senior housing was a permitted use in only one of the township's zoning districts. *Lapid-Laurel,* 284 F.3d at 467. The Circuit Court explained that regardless of the zoning restriction, "developers of group homes for the handicapped (including the elderly) may apply for use variances." *Id.* The Third Circuit went on to find that even if the plaintiff had demonstrated a *prima facie* showing of disparate impact, summary judgment should be granted in the township's favor because it had articulated non-discriminatory reasons for denying the site plan application and "no alternative would serve the township's interest with less discriminatory effect." *Id.* at 468 (citations omitted).

The Court is satisfied that Defendants have articulated nondiscriminatory land use reasons for the Planning Board's denial of Plaintiffs' change of use application as discussed above at length. *Supra.* at 26. Like in *Lapid-Laurel*, this Court is also satisfied that alternative, less discriminatory means did not exist for the Township to achieve its legitimate land use interests and determine if Plaintiffs' planned use for its

facility qualified under any of the express permitted uses for the transitory O-1 zone. This finding alone is sufficient for the Court to grant Defendants' summary judgment motion as to this Plaintiffs' disparate impact claim.

Further, the Court agrees with Defendants that Plaintiffs' disparate impact theory of liability is inconsistent with the evidence they rely upon. Plaintiffs do not cite any statistical disparities arising from the denial of its zoning applications that more adversely impacted persons with disabilities like in a typical disparate impact case. Instead, the relevant comparator evidence they offer is the zoning applications that were granted by Defendants predating the denial of their application for a change of use by the Planning Board, including Plaintiffs' own initial application submitted in Plaintiff Dr. Brown's name and RCA's application. Plaintiffs essentially concede that the Township approved zoning permits in the O-1 zone for applicants that intended to dispense methadone to patients recovering from opioid addition, among other forms of treatment. This only strengthens the argument that Defendants had nondiscriminatory land use reasons for denying Plaintiffs' application and not because of who Plaintiffs treat or what kinds of treatments they predominantly provide. The Court finds that Plaintiffs' comparator evidence regarding its own initially approved application and RCA's does not suggest that Defendants' zoning decisions disparately impact people with disabilities. In other words, the Court agrees that RCA's "approval shows the Township's neutrality to land use applications involving protected persons when the proposed use is appropriate." [Defendants' Brief at 34.]

The Court finds that Plaintiffs are unable to cite evidence to advance their disparate impact theory of liability, and that Plaintiffs' own arguments and the evidence they rely upon actually contradicts such a theory. Accordingly, Defendants' summary judgment motion shall be granted with respect to Plaintiffs' disparate impact claim, Count Two of the Complaint.

### 3.   Reasonable Accommodation

Count Three of Plaintiffs' Complaint alleges that Defendants violated the ADA when they failed to provide a reasonable accommodation. Plaintiffs argue that their counsel intentionally "acknowledged the Planning Board's authority to impose a reasonable limitation on the number of patients treated by Plaintiffs" at the close of the Planning Board hearings, but their request was unlawfully ignored by the Planning Board.  [Plaintiffs' Brief at 19.]

Public entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. 35.130(b)(7). In the context of a land use review by a local zoning board, "municipalities . . .  must change, waive, or make exceptions in their zoning rules to afford people with disabilities the same opportunity to housing as those who are without disabilities." *Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1104 (3d Cir. 1996) (quoting *Horizon House Developmental Servs., Inc. v. Twp. of Upper Southampton*, 804 F.Supp. 683, 699–700 (E.D. Pa. 1992) (collecting cases), *aff'd*, 995

F.2d 217 (3d Cir. 1993)).

In the current controversy, Plaintiffs go so far as arguing that their "counsel's attempts to engage in a proper discussion of accommodation, including patient loads and hours of operation, were brushed aside by the Planning Board's Solicitor" and were "exacerbated by the Solicitor's attempts to limit the disabled patients' treatment options through the limitation of the practice's hours of operation . . . [which] would fundamentally alter the functioning of an outpatient opioid treatment." [Plaintiffs' Brief at 20.] Even assuming that Plaintiffs' allegations are true, the Third Circuit held:

> [T]o establish that the accommodation proffered by [the applicant] was not reasonable, [the municipality] [i]s required to prove that it could not have granted the variance without: (1) imposing undue financial and administrative burdens; (2) imposing an undue hardship upon the Township; or (3) requiring a fundamental alteration in the nature of the [zoning] program.

*Lapid-Laurel*, 284 F.3d at 462 (citations and quotations omitted).

Here, the Court is satisfied that Defendants have offered sufficient evidence to grant summary judgment in their favor as to Plaintiffs' claim for failure to provide a reasonable accommodation. The Court finds Plaintiffs' purported request for an accommodation, if any, in terms of patient load or operating hours was unreasonable as a matter of law because it would require the Township to fundamentally alter in nature the permitted uses of the 0-1 zoning district. Plaintiffs even concede that changing the hours of operation would have fundamentally altered their opioid treatment program because their patients need to "acquire their necessary lifesaving medication and still report to a regular 9:00 A.M. to 5:00 P.M jobs." [Plaintiffs' Brief

at 20.] This is obviously in direct conflict with the land use requirements of the transitional, less intensive, and less commercial 0-1 zone. As discussed above, the Court is satisfied that the land use justifications provided by the Planning Board are sound. *Supra.* at 26–30.

The Court is also convinced that Plaintiffs "never presented any specific accommodations to allow for conformance to the Office-1 Zoning provisions." [Defendants' Brief at 39.] In other words, there is no evidence to suggest that Plaintiffs ever requested a reasonable accommodation in terms of patient load and/or operating hours, and what specific accommodation they requested with respect to each. Regardless, the opportunity to request a reasonable accommodation from the Planning Board or any other Defendant has long passed. Plaintiffs should not be permitted to argue—after the fact—that Defendants failed to determine the correct patient load and hours of operations that would put their facility within the requirements of the O-1 zone. It was always Plaintiffs' burden to request such a reasonable accommodation in the first instance that would meet these requirements. Regardless, the Court finds that the accommodations allegedly requested would fundamentally alter the Township's zoning program, and as such, are unreasonable as a matter of law. Accordingly, Defendants' summary judgment motion shall also be granted as to Count Three of the Complaint.

### 4. Plaintiffs' Related Claims of Selective Enforcement, Disability Discrimination Under NJLAD, and Violations of Section 1983

For the reasons set forth above, the Court will grant Defendants' summary

judgment motion as to Plaintiffs' claims of disability discrimination under Title II of the ADA for each potential theory of liability, including disparate treatment, disparate impact, and for failure to make a reasonable accommodation—Counts One, Two, and Three of the Complaint, respectively. Because the relevant analysis under the ADA and the RA are the same, the Court will also grant Defendants' motion as to Plaintiffs' claim under the RA, Count Four of the Complaint.

Plaintiffs allege a related claim of selective enforcement under the Equal Protection Clause of the Fourteenth Amendment, Count Seven of the Complaint. As discussed above, the Township Code is facially neutral. *Supra.* at 26. "A selective enforcement claim is based on the well-established principle that discriminatory enforcement of a facially neutral law violates the Equal Protection Clause." *Thorpe v. Upper Makefield Twp.*, 758 F. App'x 258, 262 (3d Cir. 2018). To succeed on their selective enforcement claim, Plaintiffs "must prove that [they were] treated differently than similarly situated individuals and that the selective treatment" was made because of some protected characteristic, here Plaintiffs' patients' disability status. *Id.* at 262–63.

The Court's analysis as to Plaintiffs' disparate treatment claim is particularly relevant. Again, Plaintiffs are primarily relying on their own initial zoning application submitted in Plaintiff Dr. Brown's name and RCA's application as comparator evidence that "Affinity had a much different experience . . . when filing its application." [Plaintiffs' Brief at 24.] Not only has the Court determined that Plaintiffs' allegations of discrimination lack evidentiary support, but the Court has

also found that Plaintiffs have failed to establish that their facility was similarly situated to RCA's in land use terms. *Supra.* at 33. Thus, the different treatment RCA experienced with its zoning application is explained by the fact that its facility operates differently in land use terms. These findings are also fatal to Plaintiffs' selective enforcement claim. Accordingly, the Court will grant Defendants' summary judgment motion as to Count Seven of the Complaint.

Like Plaintiffs' selective enforcement claim, Plaintiffs' claim for violations of Section 1983 flows directly from their claims of unlawful discrimination. Specifically, that Plaintiffs "improperly applied zoning laws to effectuate discrimination" in denying Plaintiffs' zoning applications. [Complaint ¶ 271.] Because the Court has found that Defendants' actions to enforce the Township's zoning laws was based on legitimate land use concerns and not to effectuate discrimination, the Court will grant Defendants' summary judgment motion as to Plaintiffs' claims under Section 1983, Count Five of the Complaint.

Plaintiffs' final disability discrimination claim arises pursuant to state law, specifically the NJLAD (Count Eleven). Like the ADA and RA, Plaintiffs' NJLAD claim may proceed under either a disparate treatment, disparate impact, or failure to provide a reasonable accommodation theory of liability. The Court finds that its above analysis of the evidentiary record in light of Plaintiffs' claims of disability discrimination is the same for Plaintiffs' NJLAD claim. Plaintiffs have also failed to meet their burden to provide sufficient evidentiary support to advance their state law disability claim under any potential theory of liability. Accordingly, the Court will

also grant Defendants' summary judgment motion as to Plaintiffs' claim under
NJLAD, Count Eleven of the Complaint.

**B.     Plaintiffs' Substantive Due Process Claims**

Plaintiffs' sixth cause of action alleges that Defendants violated their "due
process and equal protection rights to a fair and impartial review of its change of use
review application." [Plaintiffs' Brief at 26.] The Third Circuit recently reaffirmed
that "[t]he fundamental requirement of due process is the opportunity to be heard
and it is an opportunity which must be granted at a meaningful time and in a
meaningful manner." *S. Allegheny Pittsburgh Rest. Enterprises, LLC v. City of Pittsburgh*,
806 F. App'x 134, 139 (3d Cir. 2020) (citing *Parratt v. Taylor*, 451 U.S. 527, 540
(1981) (collecting Supreme Court cases illustrating this principle), *overruled on other
grounds by Daniels v. Williams*, 474 U.S. 327 (1986) (internal quotations omitted). As
the Court previously found above, Plaintiffs have overstated the extent to which
Planning Board members failed to pay attention during the hearings. *Supra.* at 33.
Again, Plaintiffs are correct that a few stray discriminatory questions and comments
were made. However, these facts, on their own, fail to establish that Plaintiffs were
not afforded a meaningful opportunity to be heard.

The applicable legal standard to prove a substantive due process claim is quite
high. *See Vurimindi v. City of Philadelphia*, 521 F. App'x 62, 65 (3d Cir. 2013)
(explaining that "[t]o state a substantive due process claim, [the plaintiff] must show
that the [c]ity [d]efendants deprived him of a protected property interest and that
such deprivation 'shocks the conscience'") (citations omitted). Here, the Court finds

that the relevant evidence of record comes nowhere close to shocking the conscience. The four (4) Planning Board hearings occurred via Zoom because they were held during one of the peak periods of precautionary measures taken nationwide during the COVID-19 pandemic. The Court thinks it unfair for Plaintiffs to rely on a few minutes from the four (4) hearings that were roughly 12 hours long in total. Just because Plaintiffs disagree with the Planning Board's ultimate decision does not mean they were not given a fair opportunity to present their zoning application to the Planning Board. Thus, the Court will grant Defendants' summary judgment motion as to Count Six of the Complaint.

### C.   Plaintiffs' Remaining State Law Claims

Plaintiffs' remaining state law claims—Counts Eight, Nine and Ten of the Complaint—allege that Defendants abused their discretionary authority, disregarded evidence they were required to consider, acted in an arbitrary and capricious manner, and ultimately made a zoning decision that "was wrong as a matter of law." [Complaint at 79–84.]

It is well established that a party challenging the decision by a municipality, or in this case a municipality's zoning authorities, must exhaust administrative remedies before asserting their right for judicial review. N.J. Ct. R. 4:69-5 (explaining that "[e]xcept where it is manifest that the interest of justice requires otherwise, actions . . . shall not be maintainable as long as there is available a right of review before an administrative agency which has not been exhausted"). The Court agrees that Plaintiffs' pre-litigation conduct evidences their understanding of this concept.

[Defendants' Brief at 25.] For example, when Defendant Bradley informed Plaintiffs that their initial permit could not be amended, they did not file a lawsuit in federal court, but rather filed an application for a change of use with the Planning Board. What remains unclear to this Court is why Plaintiffs never applied for a use variance to the Voorhees Zoning Board of Adjustment, which at all times, had the authority to permit uses like Plaintiffs' intended use for their facility that did not qualify under any of the permitted uses of the O-1 zone.

The Court finds that Plaintiffs' failure to exhaust administrative remedies is fatal to their remaining state law claims. The Court is convinced by Defendants' argument that any doubts regarding Plaintiffs' zoning application must be resolved in favor of denying the application and instructing the party to apply for a hearing before the Planning Board or Zoning Board. [Docket No. 67-2, at 24.] Otherwise, applicants may purchase real estate, undergo construction projects, or otherwise rely on a zoning official's assurances to their detriment, such that the municipality should later be estopped from revoking an approved zoning permit. However, here Plaintiffs never obtained the requisite license from the New Jersey Department of Health for an Outpatient Substance Use Disorder Treatment Facility License, so Plaintiffs could not have detrimentally relied upon its initially approved zoning permit when in the grand scheme of things, its licenses to operate the intended facility were very much still pending. The Court is satisfied that the actions taken by Defendant Bradley were reasonable, considering the legitimate land use concerns implicated by Plaintiffs' proposed facility. Further, Plaintiffs do not cite any statutory or legal authority that

provides a private cause of action for violation of the zoning statues and ordinances they cite.

Plaintiffs have failed to exhaust administrative remedies and the Court agrees that no right to judicial review exists merely because Defendant Bradley later determined that Plaintiffs' initial zoning permit was not accurately issued to them. The record establishes that she was correct, as Plaintiffs' proposed facility did not meet the land use requirements of the Township's O-1 zone given the nature of Plaintiffs' intended use of the facility. Plaintiffs' recourse was with the Voorhees Zoning Board of Adjustment and/or the New Jersey courts with respect to the denial of their change of use application and their underlying zoning permit application. Accordingly, the Court will grant Defendants' motion for summary judgment as to Counts Eight, Nine, and Ten of the Complaint.

## VI.   CONCLUSION

The Court is persuaded that Plaintiffs did not qualify for the zoning permit for which they applied. The evidence Plaintiffs rely on fails to establish that Defendants' decision was motivated by intentional discrimination against, had a disparate impact on, or failed to provide a reasonable accommodation for persons with disabilities. The record establishes that Plaintiffs were afforded a fair opportunity by Defendants for their zoning applications to be heard. Plaintiffs failed to exhaust administrative remedies to appeal Defendants' ultimate zoning decision; this Court cannot serve as a super zoning tribunal to challenge the ultimate denial of their zoning applications. Since Plaintiffs have failed to meet their evidentiary burden to provide concrete

evidentiary support for their claims, the Court shall **DENY** Plaintiffs' Motion for Summary Judgment [Docket No. 74] and **GRANT** Defendants' Cross-Motion for Summary Judgment [Docket No. 86].

The Court is mindful of Plaintiffs' proffer that there is outstanding discovery. However, pursuant to Fed. R. Civ. P. 56(c), if Plaintiffs are asserting that there are additional material facts that cannot be or that are genuinely in dispute, Plaintiffs were required to support such assertion by citing to particular parts of material in the record (depositions, documents, affidavits or declarations, stipulations, admissions, interrogatory answers, etc.), by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Here, Plaintiffs have failed to support their proffer of outstanding discovery with any such evidence, such that the Court is unaware of any disputed question of material fact that remains outstanding. In the event Plaintiffs choose to pursue a Motion for Reconsideration pursuant to L. R. Civ. P. 7.1(i), Plaintiffs must clearly set forth in their motion why they did not previously comply with Rule 56(c), what fact(s) additional discovery would show, how such additional fact(s) would advance their claim(s), and what particular part(s) of the record support(s) their assertion regarding outstanding discovery.

An accompanying Order of today's date shall issue.

Date:  <u>August 30, 2022</u>              s/Renée Marie Bumb
                                Renée Marie Bumb
                                U.S. District Judge